IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2003, at Jackson

## ANDREW LEVI JEFFERSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2000-A-253     Steve Dozier, Judge**

---

**No. M2002-01604-CCA-R3-PC - Filed December 12,2003**

---

The petitioner, Andrew Levi Jefferson, appeals from the Davidson County Criminal Court's denial of post-conviction and *habeas corpus* relief.  In his amended, combined petitions for relief, the petitioner challenges his 2001, guilty-pleaded convictions of second degree murder and attempt to commit especially aggravated robbery.  On appeal, the petitioner claims post-conviction relief because his trial counsel were ineffective in failing to defeat the transfer of the petitioner's case from juvenile court to criminal court, in preventing the petitioner from testifying at the transfer hearing, by failing to investigate and discover the petitioner's mental status, and in failing to present a critical issue in pretrial motions.  Also, the petitioner claims that his guilty pleas were involuntary and unknowing and that he was denied due process because he was not allowed to testify in the juvenile court transfer hearing.  In his joined claim for *habeas corpus* relief, the petitioner claims that, because of errors in the transfer from juvenile court, the criminal court lacked jurisdiction to adjudicate his case.  Based upon our review, we find no reversible error and affirm the actions of the post-conviction court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the Appellant, Andrew Levi Jefferson.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and James H. Todd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

*I. Conviction Proceedings.*

The underlying offenses relate to the shooting death of Julius Talley. The petitioner, born August 8, 1981, was seventeen years of age on January 19, 1999, when the underlying offenses were committed, and on June 10, 1999, when the juvenile court transferred his case to criminal court. After the transfer, the petitioner was indicted on one count of first degree felony murder, *see* Tenn. Code Ann. § 39-13-202(a)(2) (2003) (proscribing first degree felony murder), and one count of attempt to commit especially aggravated robbery, *id.* §§ 39-13-403 (proscribing especially aggravated robbery as a Class A offense), -12-101 (attempt), -12-107 (grading criminal attempt "one (1) classification lower than the most serious crime attempted") (2003). He was nineteen years of age on January 17, 2001, when he entered guilty pleas in criminal court to second degree murder and attempt to commit especially aggravated robbery. Pursuant to the plea agreement, he was sentenced as a Range I offender to the minimum Class A sentence of fifteen years for second degree murder and to the maximum Class B sentence of twelve years for attempt to commit especially aggravated robbery. *See id.* § 40-35-112(a)(1), (2) (2003) (delineating sentencing ranges). These Department of Correction sentences were imposed to run concurrently.

a. Transfer Proceeding.

On June 10, 1999, the Davidson County Juvenile Court conducted a hearing pursuant to Tennessee Code Annotated section 37-1-134(a) and to determine whether the "disposition of the [petitioner] shall be as if [he] were an adult." *Id.* § 37-1-134(a) (2001). After presenting extensive evidence about the petitioner's involvement in the homicide and attempted robbery, the prosecutor presented the petitioner's juvenile court file and asked the court to consider it as evidence. The juvenile court judge took "a few minutes to go through the files . . . to see . . . the prior record and . . . prior treatment efforts and the things that the code instructs me to look at." After a recess, the judge reconvened the hearing, set bond, and concluded the hearing. The juvenile court then entered an order transferring the petitioner's case to criminal court. In the order, the court recounted its review of the transfer considerations mandated by Tennessee Code Annotated section 37-1-134(b). The court found that the petitioner was seventeen years old when the offenses were committed, that he was not committable to an institution for the mentally ill or retarded, that he committed the charged offenses, and that, upon examination of "the prior record of the [petitioner] and the prior treatment received by the [petitioner]," the state "has met its burden under T[ennessee] C[ode] A[annotated] [s]ection 37-1-134 regarding the appropriateness of transfer."

b. Suppression Proceeding.

Following the transfer to, and the indictment in, criminal court, the petitioner's counsel moved to suppress the petitioner's January 21 and 25, 1999 statements on the grounds that they were obtained in violation of his rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Articles 1, 7, and 8 of the Tennessee Constitution. The motion

alleged that the petitioner's statements to police officers on both days, and to an assistant district attorney general on January 25, 1999, were rendered in violation of the principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). From evidence presented at the suppression hearing, the trial court made the following findings of fact. Acting upon information supplied by an accomplice to the shooting of Mr. Talley, officers visited the petitioner's home on January 21, 1999. The petitioner "agreed to accompany [the officers] downtown to answer some questions." At the Criminal Justice Center (CJC), the petitioner made statements implicating himself and "accompanied [an officer] to a location to obtain the alleged murder weapon." Thereafter, the officer took the petitioner home. After acquiring new information about the crime, the officer called the petitioner on January 25 and asked him "if he would come in for more questions." The officer "picked up the [petitioner] and proceeded downtown to the [CJC]." The officer testified that after arriving at the CJC, he read the petitioner his *Miranda* rights and that the petitioner waived the rights and gave a tape-recorded statement. The officer then arrested the petitioner and took him to the Juvenile Detention Center, where after the *Miranda* rights were again explained and waived, an assistant district attorney general interviewed him.

In its order denying suppression, the criminal court found that, despite the petitioner having been placed in handcuffs while being transported to the CJC on January 21, the petitioner was under no restraint while being questioned and, accordingly, was not in custody when interrogated on January 21, 1999. Based on that finding, the court then denied suppression of the January 21 inculpative statement.

The court then turned to consider whether the petitioner effectively waived his *Miranda* rights before giving the inculpative statements on January 25. The court considered the petitioner's background and his ability to read and write, accredited the testimony of the police officer who described the petitioner's demeanor during the waiver process, and found that the petitioner "voluntarily waived his *Miranda* rights in both statements given on January 25, 1999."

c. Guilty Plea Proceeding.

On January 17, 2001, the petitioner entered into a plea agreement which called for a reduction of the felony murder charge to second degree murder with a minimum Range I, Class A sentence of fifteen years in the Department of Correction. Also, the petitioner agreed to plead guilty to attempt to commit especially aggravated robbery and to serve a maximum Range I, Class B sentence of twelve years concurrently with the second degree murder sentence. On January 18, 2001, the trial court engaged the petitioner in a thorough inquiry about his desire to plead guilty and his waiver of various procedural rights. The petitioner acknowledged that his attorneys had discussed the case with him and that he had neither lingering questions nor complaints about counsel's service. The trial judge explained the terms of the plea, including the statutory provision that the second degree murder sentence would be served at 100 percent, and the petitioner acknowledged that he understood the terms. The judge explained the petitioner's rights to be tried by a jury, to be represented by counsel, to confront adverse witnesses, to compel the testimony of witnesses, to avoid self-incrimination, to testify in his own behalf, and to appeal any adverse

adjudications. The petitioner acknowledged that he understood these rights and that he wished to waive them in exchange for the plea arrangement. The petitioner acknowledged that he attained the eighth grade in school, could read and write, and that he understood the plea documents. The prosecutor stated in detail the factual basis for the pleas, and the petitioner confirmed the truth of the statement. The petitioner affirmed that he was pleading guilty freely and voluntarily.

## II. Post-Conviction Proceeding.

At the post-conviction evidentiary hearing held on May 10, 2002, the petitioner's trial attorneys testified. The petitioner's juvenile court counsel characterized the transfer proceeding in juvenile court as being one where "basically, the issue is whether the juvenile system can handle the child given the factors of the child and the child's background history versus whether a child needs to be in the adult system." Counsel reviewed with the petitioner his juvenile court history. In 1995, he had been transferred to criminal court on another homicide charge that was later dismissed. Following that, he was adjudicated delinquent in juvenile court for committing aggravated robbery and attempted homicide, and he was committed to a state juvenile institution. The petitioner was on "after-care" from that institution when he committed the instant offenses. Counsel testified that the petitioner's prior institutional placement was the "most intensive and severe" form of rehabilitation available in the juvenile justice system. Counsel admitted that she saw nothing else appropriate and available to the petitioner through the juvenile system.[1] Counsel testified that even after she had spent 25 to 30 hours conferring with the petitioner, he presented no signs of mental or psychological impairment and that he merely wanted to waive any objection to the transfer to criminal court in exchange for a lower bond. Counsel did not recall whether the petitioner requested to testify at the transfer hearing, but she testified that she normally would advise against a juvenile's testimony in such a situation.

In criminal court, counsel moved to suppress the petitioner's three pretrial statements. She did not recall discussing with the petitioner the possibility of appealing the suppression ruling, but notwithstanding, she believed that an appeal would have been futile. She admitted that in the suppression proceeding, she did not raise the issue of how much time had elapsed with the petitioner in custody before the statements were given. Counsel testified that the state had evidence other than the petitioner's statements that inculpated him in the instant offenses.

Counsel testified that she read the plea agreement to the petitioner and that he seemed to understand, although counsel was then unaware of the petitioner's IQ score. She admitted that knowledge of the IQ score might have affected the way she explained things to the petitioner. Nevertheless, counsel discussed possible theories of defense and explained the theory of criminal

---

[1]A 1995 psychological evaluation report contained in the record reveals that the petitioner's full scale intelligence quotient (IQ) score is 65, placing him in a classification of mild mental retardation. The evaluator found, however, that the petitioner "often steals from others, . . . prefers to be around others who get into trouble," has no remorse for wrongful or illegal behavior, is "highly oppositional and . . . likely to be openly defiant toward authority," and has a "high level of homicidal ideation and violation of the rights of others." The evaluator determined that the petitioner, at age twelve years and eleven months, "likely presents a threat to the community."

responsibility, which the petitioner apparently understood. Counsel sought no psychological evaluation because the petitioner gave no indication of any mental health issue.

The petitioner testified at the evidentiary hearing that he asked his lawyer whether he could testify at the transfer hearing; however, he admitted that had he testified, he would have repeated the account he gave in his pretrial statements. He testified that he had attended special education classes and had difficulty reading.

The petitioner testified that on January 25, 1999, he stayed at the CJC about six or seven hours before being booked into the juvenile facility. He acknowledged that counsel visited him seven or eight times before the plea hearing but denied that he understood everything she told him. He testified that he told counsel that he wanted to go to trial but that she overcame his will to do so when she told him that if he were convicted of first degree murder, he would receive an automatic life sentence. The petitioner testified that he did not know the meaning of "facilitation" as a lesser-included offense. He denied that counsel discussed lesser-included offenses with him. He claimed that he thought the effective fifteen-year sentence would be served at thirty percent.

In its written order denying post-conviction relief, the trial court found that "the record is clear that the juvenile court considered the entire juvenile file on the petitioner . . . when considering whether to transfer these cases." The post-conviction court found that the juvenile court complied with the law when it transferred the petitioner's case to criminal court and, moreover, found that the petitioner "failed to show how [his] lack of testimony [at the transfer hearing] rendered the outcome of the transfer hearing unreliable." The court ruled that the petitioner also failed to show that he was prejudiced by his lack of testimony at the transfer hearing. The post-conviction court found that trial counsel had adequately prepared the case and advised the petitioner, and the petitioner failed to show prejudice in support of his claim that counsel should have utilized a statutory basis for seeking suppression of the petitioner's pretrial statements. Also, based upon its rulings that the transfer to criminal court was proper, the post-conviction court held that the criminal court had jurisdiction over the petitioner and his case; it thus denied *habeas corpus* relief.

### III. Post-Conviction Procedure.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the appellate court accords to the lower court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

### IV. Adjudication of the Petitioner's Claims.

### a. Ineffective Assistance of Counsel.

First, we address the petitioner's claims that his convictions were the product of ineffective assistance of counsel, in contravention of the Sixth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution. *See Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). He claims that counsel was ineffective in failing (1) to press the juvenile court on the issues whether the petitioner's prospects for rehabilitation in the juvenile system and his mild mental retardation defeated the state's effort to transfer the case to criminal court, (2) to present the petitioner as a witness in the transfer hearing, (3) to discover and exploit the petitioner's mild mental retardation as a means of defending the charges in criminal court, (4) to adequately advise the petitioner prior to entering into a plea agreement, particularly with respect to the possibility of facilitation as lesser-included offenses of the charged offenses, and (5) to raise the issue of length of detention in the motion to suppress.

In determining whether the evidence preponderates against the post-conviction court's findings that the petitioner received effective assistance of counsel, this court considers (1) whether counsel's performance was within the range of competence demanded of attorneys in criminal cases, *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and (2) whether any deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-79, 104 S. Ct. 2052, 2064-2069 (1984); *see Powers v. State*, 942 S.W.2d 551, 557 (Tenn. Crim. App. 1996). We need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley*, 960 S.W.2d at 580.

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather in the context of the case as a whole. *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern should be the fundamental fairness of the proceeding whose result is being challenged. *Id.* This court should not second-guess tactical and strategic decisions by defense counsel. *Henley*, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. *Id.*; *see also Irick v. State*, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). However, this court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of defense options. *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987).

Even if the petitioner establishes that counsel's performance was not within the requisite range of competence, he must also demonstrate a reasonable probability that the result of the proceeding would have been different but for the defective performance of counsel. *Henley*, 960 S.W.2d at 580. The prejudice prong of the *Strickland* test "continues to be the primary hurdle to be cleared in Sixth Amendment assistance of counsel cases," but "[t]his obstacle . . . is not insurmountable." *Profitt v. Waldron*, 831 F.2d 1245, 1251 (5th Cir. 1987).

> A court must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the

inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

*Henley*, 960 S.W.2d at 580 (citations omitted).

In cases involving a guilty plea or plea of *nolo contendere*, the petitioner claiming ineffective assistance of counsel must show prejudice by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

(1), (2)

First, we review the complaints that counsel failed to adequately oppose the transfer from juvenile court by neglecting to present options for juvenile rehabilitation programs and to establish the petitioner's IQ score of 65. When considering a transfer of a juvenile to adult disposition in criminal court, the court is mandated to consider certain factors:

> In making the [transfer] determination required by subsection (a), the court shall consider, among other matters:
>     (1) The extent and nature of the child's prior delinquency records;
>     (2) The nature of past treatment efforts and the nature of the child's response thereto;
>     (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>     (4) Whether the offense was committed in an aggressive and premeditated manner;
>     *(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state*; and
>     (6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

Tenn. Code Ann. § 37-1-114(b) (2001) (emphasis added). In the present case, the petitioner argues that the juvenile court failed to make any findings about his prospects for rehabilitation through the juvenile justice system and that his counsel failed to press the issue. Implicit in the petitioner's position is the claim that, had counsel advanced the issues of the aptness of juvenile programs and the circumstance of the petitioner's mild mental retardation, the juvenile court would have denied the transfer request. The petitioner argues that because counsel failed to highlight his low IQ score, the juvenile court was unaware that it was empowered to grant psychological or mental examinations for the child. *See id.* § 37-1-128(e) (2001).

-7-

In our view, although the juvenile court could have made more specific factual findings relative the statutory factors for transferring a juvenile to criminal court, that court did review the evidence, including the petitioner's prior juvenile court record, and based upon all the evidence, it essentially determined that any factors favoring a juvenile disposition of the case were overcome by the factors indicating the aptness of a transfer. Moreover, we must agree with the assessment of the petitioner's juvenile court counsel that the evidence, including the prior record and evaluation report, showed that the juvenile court had little choice but to transfer the petitioner to criminal court. In essence, the juvenile court had exhausted its available remedies and had previously failed to rehabilitate a young man who posed a violent threat to the community. Thus, the petitioner has failed to demonstrate the requisite prejudice. Moreover, we discern no deficient performance of counsel in failing to take actions to exploit the petitioner's mental limitations and his rehabilitation potential. Given the petitioner's dismal chances of prevailing on the transfer issue, we must defer to counsel's strategic choice to pursue the petitioner's request by using the opportunity to obtain a lower bond, which counsel was apparently successful in doing.

We believe the overwhelming evidence favored transfer of the petitioner to criminal court,[2] and the petitioner's desire to obtain a lower bond fueled a strategy of acceding to the state's transfer request once the state had established the probability that the petitioner was involved in the crimes. That strategy logically embraced the tactic that the petitioner should avoid testifying. His testimony would commit the petitioner to a sworn, on-the-record account of his role in the crimes, and in any event, it likely would have been futile to testify. Thus, testifying presented a nothing-to-gain, something-to-lose scenario. The "something to lose" seems particularly poignant when we consider that, had the petitioner testified, he would have adopted and essentially galvanized his pretrial inculpative statements, which in criminal court he later tried to have suppressed. Thus, the petitioner has demonstrated no lower-court error in finding that his juvenile court counsel rendered effective assistance at the transfer hearing.

(3)

The petitioner claims that trial counsel were ineffective in failing to discover his mild mental retardation and in failing to employ it as a defense theory in criminal court. We agree that trial counsel should have been aware of the petitioner's IQ score, but we discern no prejudice in failing to discover or utilize the mental status as a defense strategy. The petitioner did not establish at the evidentiary hearing below how any mental limitation or psychological condition would have affected his culpability for the present crimes or would have impaired his competency to participate in the criminal court proceedings. Counsel's testimony, accredited by the post-conviction court,

_____

[2]We are aware that the record contains no psychological report on the petitioner more recent than the 1995 report that was a part of his juvenile history; however, our task in this post-conviction proceeding is to determine whether the evidence preponderates against the post-conviction court's finding that the petitioner failed to carry his burden of proving his claims by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f) (2003). In other words, he failed to introduce evidence *at the post-conviction evidentiary hearing* to show that his psychological, mental, or rehabilitative status was different in 1999 than it was in 1995.

showed that despite many substantive discussions with the petitioner, counsel perceived no basis for thinking him mentally deficient or even for seeking a mental or psychological evaluation. Thus, the post-conviction record fails to establish that the petitioner was prejudiced by counsel's failure to discern and exploit his mental and/or psychological condition.

(4)

In his next ineffective assistance issue, the petitioner complains that his trial counsel failed to explain his legal circumstances and, in particular, failed to advise him that a trial could possibly result in the petitioner being convicted of facilitation of the charged crimes. *See* Tenn. Code Ann. § 39-11-403 (2003) (proscribing facilitation of a felony as an offense punishable in an offense class next below that of the charged offense); *State v. Burns*, 6 S.W.3d 453, 466-67 (1999) (establishing facilitation as a lesser-included offense of the charged offense when complicity is an issue).

Assuming that counsel did not impart this information to the petitioner, and even if that lapse equates to deficient performance, we are unpersuaded that the petitioner has shown prejudice as contemplated by *Strickland*. The petitioner was otherwise fully advised of his legal circumstances, including the nature of the state's theory of his responsibility for the crimes of another. Furthermore, by our reckoning, the plea agreement was very favorable to the petitioner. The petitioner was fully aware that through this plea agreement he avoided the risk of life imprisonment. He failed to convince the post-conviction court that had he been informed about facilitation as a lesser-included offense, he would have eschewed the plea and gone to trial. The evidence does not preponderate against this finding.

(5)

In his next claim of ineffective assistance, the petitioner argues that trial counsel were remiss in not using Tennessee Code Annotated section 37-1-115 as a basis for the suppression of his pretrial statements. That section provides:

> (a) A person taking a child into custody shall *within a reasonable time*:
>
> (1) Release the child to such child's parents, guardian or other custodian upon a promise by such person or persons to bring the child before the court when requested by the court unless such child's detention or shelter care is warranted or required under § 37-1-114; or
>
> (2) Bring the child before the court or deliver such child to a detention or shelter care facility designated by the court or to a medical facility if the child is believed to suffer from a serious

physical condition or illness which requires prompt treatment. A person taking a child into custody shall give notice thereof, together with a reason for taking the child into custody, to a parent, guardian or other custodian and to the court. If the child is taken into custody pursuant to the provisions of § 37-1-113(a)(3) prior to the filing of a petition, a petition under § 37-1-120 shall be filed as soon as possible but in no event later than two (2) days after the child is taken into custody excluding Saturdays, Sundays and legal holidays.

(b) If a parent, guardian or other custodian, when requested, fails to bring the child before the court as provided in subsection (a), the court may issue its warrant directing that the child be taken into custody and brought before the court.

Tenn. Code Ann. § 37-1-115(a), (b) (2001) (emphasis added); *see id.* § 37-1-127(c) (2001) (providing that "[a]n extra-judicial statement, if obtained in the course of violation of this part or which would be constitutionally inadmissible in a criminal proceeding, shall not be used against [a child]").

The petitioner relies upon his testimony that on January 25, 1999, he spent up to two and one-half hours at the CJC, where he was interrogated and gave an inculpative statement, before being brought to the juvenile center, where he was again interrogated and gave another statement. The petitioner testified that, in total, six or seven hours elapsed between the time he was picked up at his residence and the time he was ultimately "booked" at the juvenile center.

In our view, the petitioner has failed to show that he was prejudiced by counsel's failure to raise the statutory issue in the motion to suppress. First, our supreme court has held that Code section 37-1-127(c) guarantees only that a juvenile's statements taken in violation of section 37-1-115 will not be used against him or her in a proceeding *in juvenile court. Colyer v. State*, 577 S.W.2d 460, 462 (Tenn. 1979) (emphasis added). In addition, the petitioner failed to show by clear and convincing evidence that the lapse of time between taking him into custody and delivering him to the juvenile center was unreasonable.

When considering the suppression of a juvenile's post-custody statement, the proper "inquiry is whether the reasonable time requirements of the statute have been met and whether, under the totality of the circumstances, the defendant's confession was the result of a knowing and intelligent waiver of his constitutional rights." *State v. Lundy*, 808 S.W.2d 444, 446 (Tenn. 1991). We believe that, in looking at the totality of the circumstances, the present case is strikingly analogous to *Lundy*:

At the time police received information about Willie Lundy, they did not have probable cause to make an arrest, although they did have an adequate basis for further investigation. Moreover, individual

-10-

interrogation of Lundy was a reasonable method of investigation under the circumstances. Within minutes of being picked up from school, Lundy volunteered an incriminating response to his mother's question. Upon arriving at the police station, Lundy was advised of his rights and, within an hour and twelve minutes of leaving school, he had made a full statement of his involvement in Maxwell's death. Although his detention at the hands of the police lasted beyond that period of time, the admissibility of subsequently seized evidence is not at issue. Lundy was turned over to the jurisdiction of juvenile court less than five hours after leaving school. Under the particular facts of this case, we hold that this was a reasonable period of time under T[ennessee] C[ode] A[nnotated section] 37-1-115(a).

*Lundy*, 808 S.W.2d at 447. In the present case, it is difficult to determine when the petitioner was placed into custody on January 25; however, the custody probably commenced when the petitioner completed his first statement on that date. Sometime later, apparently less than six or seven hours, he was taken to the juvenile center. Based upon *Colyer* and *Lundy*, the petitioner has failed to show that had he raised the statutory issue in his motion to suppress, he would have prevailed. This failure equates to a failure to show prejudice pursuant to *Strickland*. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583 (1986) (where failure to litigate suppression is basis of ineffectiveness claim, defendant must also prove suppression motion is meritorious).

Thus, we hold that the record supports the post-conviction court's determination that the petitioner failed to establish ineffective assistance of counsel.

### b. Involuntary, Unknowing Guilty Pleas.

The petitioner next claims that his guilty pleas should be vacated because his pleas were unknowing and hence involuntary. To be sure, a guilty plea must be made knowingly and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 242-44, 89 S. Ct. 1709, 1712 (1969). To that end, "defendants should be advised of certain of their constitutional rights before entering pleas of guilt. Included among those required warnings are the right against self-incrimination, the right to confront witnesses, and the right to a trial by jury." *Charlton v. State,* 987 S.W.2d 862, 866 (Tenn. Crim.

App. 1998). Our supreme court has identified several relevant factors in determining whether a plea is voluntary and intelligent:

> [A] court charged with determining whether those pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from jury trial.

*Wallen v. State*, 863 S.W.2d 34, 38 (Tenn. 1993)

Although, based upon the IQ score, the petitioner's intelligence is less than formidable, the other *Wallen* factors support a finding that the petitioner's plea was knowing and voluntary. The petitioner had been involved previously with proceedings in juvenile court and had experienced a previous transfer of a homicide case to criminal court, albeit one in which the charge was dismissed. Based upon the record before us, the petitioner was represented by competent counsel who conferred with him extensively. Counsel's accredited testimony showed that counsel rendered intricate advice on the issues at hand. Moreover, the record of the plea-submission hearing belies the petitioner's claim in his brief that "insufficient time was taken to ensure that the Petitioner understood what he was doing." At the hearing, the trial court tediously explained the petitioner's rights to him, and the petitioner responded affirmatively – not perfunctorily – that he understood his rights and that he waived them. Although he maintained in the post-conviction hearing that he did not understand that the second degree murder sentence must be served at 100 percent, the plea documents reveal otherwise. The petitioner, in his evidentiary hearing testimony, even acknowledged that trial counsel had imparted to him an accurate description of the second degree murder sentence. Also, the trial court expressly informed the petitioner during the plea colloquy that the fifteen-year sentence entailed a requirement of 100 percent service. The petitioner told the trial court that he understood this provision. Finally, it is apparent on the record that the petitioner reasonably agreed to the plea arrangement in order to avoid a possible life sentence.

Under all of the circumstances, we conclude that the post-conviction court was justified in determining that the guilty pleas were made knowingly and voluntarily.

c.  Denial of Right to Testify at Transfer Hearing.

Citing *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), the petitioner asserts that he was denied his right to testify in his juvenile court transfer hearing.   In *Momon*, our supreme court held that "a criminal defendant's right to testify is a fundamental constitutional right guaranteed both by Article I, section 9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution . . . [, and a]s such, the right must be personally waived by the criminal defendant." *Id.* at 155.  We find nothing in the record to indicate that the defendant personally waived his testimony at  the transfer hearing.

Assuming, purely for purposes of argument, that *Momon* even applies to proceedings other than to a *trial* on a criminal charge,[3] we have no doubt that a denial of the right was harmless beyond a reasonable doubt.  *See id.* at 166-67 ("[D]enial of the right to testify has been appropriately characterized as a trial error which is subject to the harmless error doctrine.").   The petitioner testified at the post-conviction evidentiary hearing that at the transfer hearing he would have testified along the lines of his inculpating pretrial statements.   Thus, we are at a loss to see how such testimony would have altered the juvenile court's decision to transfer the case to criminal court.  Furthermore, as we have mentioned above, the juvenile court clearly had unsuccessfully utilized its most severe and intensive programs as a means of rehabilitating an offender who is inverately prone to violent behavior.   The evaluation report before the juvenile court said that the petitioner prefers to associate with other law-breaking peers, he is "highly oppositional and . . . likely to be openly defiant toward authority[,] . . . has a high level of homicidal ideation in violation of the rights of others [,] . . .  has little or no empathy for [his victims, and] . . . is a threat to the community."  Faced with this sanguine portrayal of an intractably violent person, we are confident that the juvenile court would have transferred the case to criminal court despite the testimony the petitioner says he would have offered.   Thus, he did not establish by clear and convincing evidence that a denial of his right, if any, to testify at the transfer hearing would have resulted in a juvenile court disposition of his case.

e.  *Habeas Corpus* Claim.

When counsel amended the post-conviction petition, he included a claim that the petitioner was entitled to *habeas corpus* relief because the conviction court lacked jurisdiction.  He based this argument upon his underlying claim that the juvenile court transfer proceeding was infirm.

First, we are constrained to point out that merely appending a claim in *habeas corpus* to a petition brought pursuant to the Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101

---

[3]After reviewing the history of both the federal and state constitutional guarantees of the right to testify, the *Momon* court stated, "[T]he right of a criminal defendant to testify in his or her own behalf is a fundamental constitutional right." *Id.* at 161.  Then, the court added, "Since the right to testify *at one's own trial* is a fundamental right, it follows that the right may only be waived personally by the defendant." *Id.* at 161 (emphasis added).

*et seq.* (2003) invites futility. Tennessee law requires that *habeas corpus* claims comply with a statutorily prescribed regimen.

> (a) Application for the writ shall be made by petition, signed either by the party for whose benefit it is intended, or some person on the petitioner's behalf, and verified by affidavit.
>
> (b) The petition shall state:
>
> (1) That the person in whose behalf the writ is sought, is illegally restrained of liberty, and the person by whom and place where restrained, mentioning the name of such person, if known, and, if unknown, describing the person with as much particularity as practicable;
>
> (2) The cause or pretense of such restraint according to the best information of the applicant, and if it be by virtue of any legal process, a copy thereof shall be annexed, or a satisfactory reason given for its absence;
>
> (3) That the legality of the restraint has not already been adjudged upon a prior proceeding of the same character, to the best of the applicant's knowledge and belief; and
>
> (4) That it is first application for the writ, or, if a previous application has been made, a copy of the petition and proceedings thereon shall be produced, or satisfactory reasons be given for the failure so to do.

Tenn. Code Ann. § 29-21-107 (2000). By merely stating the *habeas corpus* claim as an alternative claim for relief in his post-conviction petition, the petitioner has failed to comply with the requirements set forth in Code section 29-21-107(a) and provisions (1), (3), and (4) of subsection 29-21-107(b). "[T]he procedural provisions of the [habeas corpus] statutes are mandatory and must be followed scrupulously." *Archer v. State*, 851 S.W.2d 157, 165 (Tenn. 1993). Thus, the post-conviction (*habeas corpus*) court was warranted in dismissing the claim based upon procedural deficiency.

The *habeas corpus* claim is also, however, lacking in its substantive merit. "[T]he writ of [*habeas corpus*] will issue in Tennessee only when it appears upon the face of the judgment or the record of the proceedings upon which the judgment is rendered that a convicting court was without jurisdiction or authority to sentence a defendant, or that a defendant's sentence of imprisonment or other restraint has expired." *State v. Ritchie,* 20 S.W.3d 624, 630 (Tenn. 2000) (quoting *Archer*, 851 S.W.2d at 164). "A void judgment is one in which the judgment is facially

invalid because the court lacked jurisdiction or authority to render the judgment or because the defendant's sentence has expired." *Taylor v. State*, 955 S.W.2d 78, 83 (Tenn. 1999). In contrast, "[a] voidable conviction or sentence is one which is facially valid and requires the introduction of proof beyond the face of the record or judgment to establish its invalidity." *Ritchie*, 20 S.W.3d at 630 (quoting *Taylor*, 955 S.W.2d at 83). Facial invalidity means that the "fact [depriving the court of jurisdiction] must appear clearly and indisputably either on the face of the judgment or in the original trial record before a writ of habeas corpus can issue from a Tennessee court." *Ritchie,* 20 S.W.3d at 633.

The petitioner claims that because the juvenile court failed to consider all of the factors for transfer to criminal court, the transfer order is void, and hence, the criminal court lacked jurisdiction to adjudicate the petitioner's case. We conclude, however, that the juvenile court's transfer order reflects a complete adjudication of the transfer issue. Thus, the claimed defect does not appear on the face of the record and, therefore, cannot give rise to a claim in *habeas corpus*.

Additionally, we have elsewhere in this opinion rejected the claim that any defect attends the transfer proceeding in juvenile court. For this reason, as well as those stated immediately above, the *habeas corpus* claim must fail.

*V. Conclusion.*

We discern no basis for reversing the actions of the lower court and affirm the denial of post-conviction and *habeas corpus* relief.

_____
JAMES CURWOOD WITT, JR., JUDGE

-15-