**STATE of Tennessee, Appellee,**

v.

**William Samuel LUNDY, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

March 18, 1991.

Charles W. Burson, Atty. Gen. and Reporter, Michaela K. Mathews, Asst. Atty. Gen. Nashville, for appellee.

Sam G. Smith, Jr., Knoxville, for appellant.

## OPINION

DAUGHTREY, Justice.

This case involves the interrogation and subsequent arrest of a fifteen-year-old boy who was tried as an adult and convicted of second degree murder. We are asked to rule that the defendant's pre-trial statements to police should have been suppressed at the transfer and acceptance hearings that were held to determine whether he should be tried as an adult,

because those statements were allegedly taken in violation of T.C.A. § 37–1–115. That statute requires that a juvenile who is "taken into custody" must be delivered to juvenile court or released to his parents or guardian "within a reasonable time."

The defendant alleges specifically that the police delayed too long in taking him to juvenile court, opting instead to detain him in police custody in order to obtain a confession. He insists that if the statements he gave police had been suppressed at the transfer and acceptance hearings, he would not have been found suitable for trial as an adult. The defendant also alleges that even if there were other grounds sufficient to sustain the transfer order, the statements should not have been used against him at trial.

The Court of Criminal Appeals affirmed the defendant's conviction, holding that because his mother "signed defendant out of school and was present at all time[s] during the interrogation and until he was delivered to the juvenile court," the requirements of T.C.A. § 37–1–115 were met, despite a delay of almost five hours between those two events. Because we disagree with the intermediate court's interpretation of the statute in this regard, although not with its result, we granted review in this case. For the reasons stated below, we now affirm.

The body of James Edward Maxwell, the night custodian at Van Gilder High School in Knox County, was found lying in a school hall on the morning of October 15, 1986. Maxwell had been robbed and brutally stabbed and beaten to death. At first the police had no leads and no suspects in the murder, but eventually they received information from a confidential informant that led them to the fifteen-year-old defendant, William (Willie) Lundy, and his two adult co-defendants. On October 21, 1986, almost a week after Maxwell's murder, Detectives Gary Jones and Jerry McNair of the Knoxville Police Department went to the apartment of Diontha Lundy, the defendant's mother, and told her that they needed to talk with her son. Mrs. Lundy voluntarily accompanied the investigators to Rule High School, where the defendant was a student, and signed her son out of school at 1:00 p.m.

While in the police car with the two officers and his mother, Willie Lundy asked, "What's this all about?" Jones replied, "Well, I think you know what it's about. It's a pretty serious problem." Mrs. Lundy turned to her son and asked, "What's this about, Willie? Murder?" "Yes," answered the defendant. Detective Jones then told the defendant not to say anything else until he was advised of his rights.

The detectives, defendant Lundy, and his mother arrived at the Youth Division office of the Knoxville Police Department at 1:10 p.m. Detectives William French and Charles Burdren took charge of the defendant. Mrs. Lundy continued to remain with her son during his interrogation and detention. French advised the defendant of his Miranda rights, and at 1:18 p.m. the defendant and his mother signed a rights waiver. The officers and the defendant then "talked ... a little bit about the situation." When the defendant mentioned that he had given the tennis shoes he had worn the night of the murder to his cousin, Buddy Davis, Detective Jones left and retrieved the shoes from Davis.

At 1:41 p.m. the defendant began giving a statement, tape-recorded by the officers and eventually transcribed to 27 pages. As noted earlier, the defendant's mother was with him at all times. During the interrogation the police asked her if there was anything she wanted to ask her son, to which she replied, "No, I'm surprised, Charlie. I didn't really know what was going on, that's the first I heard about it, when we got up here." The defendant concluded his statement at 2:12 p.m. In it, he admitted stabbing the victim and said that he received $400 of the $1,200 taken from Maxwell.

About 4:30 p.m., the defendant signed a second rights waiver allowing the police to search his home for the bluejeans he had been wearing the night of the killing. He and his mother rode with the officers to his residence, where they stopped on the way to juvenile court. The defendant also showed the officers the route he and his

co-defendants had driven after they killed Maxwell, and he attempted to help them locate the place where the handle of the knife used to stab the victim had been thrown. Sometime between 5:30 and 6:00 p.m., less than five hours after he was taken into custody, the police delivered the defendant to juvenile court. The officers then dropped Mrs. Lundy off at a Knoxville grocery store.

The propriety of the officers' conduct in this case is governed by T.C.A. § 37–1–115, regulating procedures in juvenile court. In pertinent part, that statute provides:

> (a) A person taking a child into custody shall within a reasonable time:

> (1) Release the child to his parents, guardian or other custodian upon their promise to bring the child before the [juvenile] court when requested by the [juvenile] court unless his detention or shelter care is warranted or required under T.C.A. § 37–1–114, or

> (2) Bring the child before the [juvenile] court or deliver him to a detention or shelter care facility designated by the [juvenile] court ...

A subsequent provision in T.C.A. § 37–1–127(c) requires that "[a]n extra-judicial statement, if obtained in the course of violation of this part or which would be constitutionally inadmissible in a criminal proceeding shall not be used against [a child]." The defendant insists that the provisions of § 37–1–115(a) were not met in this case, and that his pretrial statements are thus inadmissible under § 37–1–127(c).

We conclude, first of all, that these statutory provisions are inapplicable to the use of Lundy's statement at trial. This Court has held that T.C.A. § 37–1–127(c) guarantees only that a juvenile's statements taken in violation of T.C.A. § 37–1–115 will not be used against him or her in a proceeding in juvenile court. *Colyer v. State*, 577 S.W.2d 460, 462 (Tenn.1979); *see also State v. Turnmire*, 762 S.W.2d 893, 896 (Tenn. Crim.App.1988). We further conclude that the statutory prerequisites of T.C.A. § 37–1–115(a)(2) were met in this case and that Lundy's statements are therefore not

inadmissible under § 37–1–127(c), regardless of the forum.

■ Over the course of the history of this statute, changes have been made to balance the competing goals of effective law enforcement and the protection of children. When it was first enacted, T.C.A. § 37–215 provided that children taken into custody should be released to their parents or taken before a court "directly and with all reasonable speed." 1970 Tenn.Pub. Acts, Ch. 600, § 15. In *State v. Strickland*, 532 S.W.2d 912, 918 (Tenn.1975), we held that this language implied that a juvenile could only be detained and questioned after permission was obtained from juvenile court. It "effectively prohibited detention and questioning immediately after taking a child into custody." *Colyer v. State*, 577 S.W.2d 460, 462 (Tenn.1979). In response to the *Strickland* decision, the statute was amended, effective March 29, 1976, by substituting "within a reasonable time" for "directly and with all reasonable speed." 1976 Tenn.Pub.Acts Ch. 745. Under the statute as amended, police officers may temporarily detain and question juveniles before release to a parent or delivery to the court. *State v. Manus*, 632 S.W.2d 137, 140 (Tenn.Crim.App.1982). The proper post-*Strickland* inquiry is whether the reasonable time requirements of the statute have been met and whether, under the totality of the circumstances, the defendant's confession was the result of a knowing and intelligent waiver of his constitutional rights. *State v. Gordon*, 642 S.W.2d 742, 744 (Tenn.Crim.App.1982).

With respect to whether the statutory requirements were met in this case, the Court of Criminal Appeals held:

> The defendant was not brought before the court within a reasonable time within the meaning of the statute; however, we are constrained to hold that the presence of the minor child's mother throughout the interrogation, while she did not testify, satisfied the requirements of the statute.

We disagree with the rulings of the Court of Criminal Appeals on both the question of reasonableness and the question of the effect of parental presence during the interrogation.

■ Parental presence during interrogation is obviously not the same as the release to a parent, guardian, or custodian contemplated by T.C.A. § 37–1–115(a)(1). Indeed, we find no authority to support such an interpretation of the statute in any reported case involving parental presence during interrogation of a child. *See, e.g.,* *State v. Strickland,* 532 S.W.2d 912 (Tenn. 1975); *Colyer v. State,* 577 S.W.2d 460 (Tenn.1979); *State v. Manus,* 632 S.W.2d 137 (Tenn.App.1982). The release to a parent, guardian or custodian referred to in the statute must be construed to mean release from police custody. If a parent is not free to take the child away from police custody, the duties under which the parent labors—the duty of loyalty to the child and the duty to mold the child into a responsible citizen—may conflict. The result could well be conduct by the parent which does nothing to protect the child, such as Mrs. Lundy's statement during her son's interrogation, "That's the first I've heard about it." At worst, parental presence while the child is in police custody may prejudice the child's case, as did Mrs. Lundy's question ("What's this about, Willie? Murder?") that prompted Lundy to make an incriminating statement in the police car. The legislative intent behind this extra protection, available only to minors, was undoubtedly to guard against the possibility of coercion inherent in the interrogation of a child. Mere parental presence during the interrogation process does not offer the same protection as release to the custody of parents, nor, for reasons made obvious by this case, can it be said to constitute constructive release.

■ There is no evidence that Willie Lundy was ever released from police custody to the custody of his mother pursuant to T.C.A. § 37–1–115(a)(1). We therefore reverse that portion of the judgment of the Court of Criminal Appeals holding that the provisions of T.C.A. § 37–1–115(a)(1) were met.

■ However, we hold that, pursuant to the provisions of T.C.A. § 37–1–115(a)(2), the defendant was brought before the juvenile court within a reasonable time of being detained. At the time police received information about Willie Lundy, they did not have probable cause to make an arrest, although they did have an adequate basis for further investigation. Moreover, individual interrogation of Lundy was a reasonable method of investigation under the circumstances. Within minutes of being picked up from school, Lundy volunteered an incriminating response to his mother's question. Upon arriving at the police station, Lundy was advised of his rights and, within an hour and twelve minutes of leaving school, he had made a full statement of his involvement in Maxwell's death. Although his detention at the hands of the police lasted beyond that period of time, the admissibility of subsequently seized evidence is not at issue. Lundy was turned over to the jurisdiction of juvenile court less than five hours after leaving school. Under the particular facts of this case, we hold that this was a reasonable period of time under T.C.A. § 37–1–115(a).

The judgment of the Court of Appeals is affirmed.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.