IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

MARCH 1998 SESSION

FILED

July 29, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | No. 02C01-9711-CR-00427 |
| Appellee, | * | Shelby County |
| vs. | * | Hon. Bernie Weinman, Judge |
| CHRISTOPHER A. WILLIAMS, | * | (Attempted Aggravated Robbery) |
| Appellant. | * | |

For Appellant:

James V. Ball
Attorney at Law
217 Exchange Avenue
Memphis, TN  38105

For Appellee:

John Knox Walkup
Attorney General & Reporter

Peter M. Coughlan
Assistant Attorney General
425 Fifth Avenue North
Cordell Hull Building, Second Floor
Nashville, TN  37243-0493

Patience Branham
Assistant District Attorney General
Criminal Justice Complex
201 Poplar Street, Suite 301
Memphis, TN  38103

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

## OPINION

The defendant, Christopher A. Williams, was indicted for first degree murder, felony murder and attempted aggravated robbery and tried as an adult. The first trial ended in a mistrial. In the second trial, the jury could not reach a verdict on either of the murder indictments but found the defendant guilty of attempted aggravated robbery. The defendant, fourteen years old at the time of the offense, was sentenced as a Range I offender to six years in the county workhouse and fined $1,000.00. In this appeal of right, the defendant challenges the sufficiency of the evidence.

We find no error and affirm the judgment of the trial court.

At about 9:30 P.M. on August 19, 1995, Michael Byrd was walking to his Memphis apartment when he saw the victim, Jerry McNeal, lying motionless on the ground. Initially, Byrd thought the victim was asleep but, as he walked nearer, noticed blood near the victim's mouth. Byrd then called the police and, upon their arrival, led them to the victim. Officer Cham Payne determined that the black male victim had died, having been shot twice in the back and once in the right calf.

At trial, James Hayes, who lived in a nearby apartment, testified that he had heard three shots between 7:30 and 8:00 on the night of the killing. He went outside, looked through a fence, and saw the victim lying on the ground near a church where Byrd later discovered the body.

Officer Edward Cash testified that he had been unsuccessful in locating eyewitnesses to the shooting but had received a tip from Crime Stoppers implicating the defendant. Two days after the death of the victim, Officer Cash and

2

Sergeant Nichols drove to the home of the defendant's mother, Gloria Williams. Officer Cash explained that the police were conducting a murder investigation and that he wanted to talk with the defendant at his office. Ms. Williams and the defendant were transported to the police station in an unmarked car. According to the officer, neither Ms. Williams nor the defendant indicated any reluctance to cooperate in the investigation. Officer Cash recalled that Ms. Williams "wanted to find out herself." The defendant and his mother acknowledged being informed of their rights and each signed a waiver form. Officer Cash testified that the defendant did not appear afraid to talk and that he made the following statement in the presence of his mother and brother:

| | |
|---|---|
| Cash: | On Saturday, August 19, 1995 at approximately 8:30 PM, while near the church located at 3510 Millbranch did you sho[o]t and kill a male black? |
| Defendant: | I shot him in the leg and then as he ran I fired three more shots in the direction of him, to scare him and he fell to the ground on the side of the church, but I didn't think I had killed him. |
| Cash: | What type of weapon did you use when you shot this male/black? |
| Defendant: | A silver with brown handles .25 semi-automatic. |
| Cash: | Where did you get this gun? |
| Defendant: | From a dud[e] named "Black." |
| Cash: | Who were you with when this incident occurred? |
| Defendant: | Same man, named "Black." |
| Cash: | Describe "Black." |
| Defendant: | Male/black, in his late teens, approximately 6' 5", slim build, approximately 160 pounds, with short jehrie curl combed toward the back, with one gold upper front tooth. He stays in the rear of the Kingsgate Apartments. |
| Cash: | What was "Black" wearing on the night of the shooting? |
| Defendant: | Black knee-length short pants, and a button-up short sleeve dark colored shirt. I don't remember if he was wearing socks, but he had black tennis shoes on. I believe he was wearing a gold wrist watch on his right arm. |
| Cash: | Where exactly did this shooting occur. |
| Defendant: | There is a path, know[n] as a "cut," that goes from the Kingsgate Apartments toward the rear parking lot of a church. |
| | *** |
| Defendant: | Me and "Black" were on the church parking lot coming from the BP gas station at the corner of Winchester and Millbranch and as we got to the "cut," we saw this male/black walking from the "cut" towards us. Then "Black" said, "Let's rob that man." Then "Black" gave me the .25 semi-automatic and I called the male/black over to me and he came to me. Then I put the pistol |

3

up and pointed at this man's upper body. This male/black pushed the pistol in my hand down toward his legs, then I pulled the trigger and he was shot in the leg. Then this male/black started running towards the church. I blasted the gun three (3) more times. Then the man was still running and I ran out of bullets and the man kept running to the side of the church and the male black fell face down in the grass on the side of the church. I saw him on the ground crawling, then me and "Black" started walking through the "cut" towards the Kingsgate Apartments and went to the Honey-[Comb].

\*\*\*

Cash: What happened to the pistol ...?

Defendant: "Black" put the pistol in the bushes along side of a brick that was in the bushes. I was with "Black" when he hid the gun there, and "Black" said, "This is the stash spot."

Cash: Did you take Sgts Nichols and Cash along with your mother back to the "stash place" which we learned was in the rear of 1828 Victory?

Defendant: Yes I did, but the brick was there, but the [gun] was not there. (alteration in original).

Cash: Do you know what happened to this weapon?

Defendant: No, sir.

Cash: Did "Black" fire a weapon during this robbery attempt when the male/black was killed?

Defendant: No, sir. Not at the time that I was with him.

\*\*\*

Cash: Did you or "Black" obtain any valuables from this male/black that you attempted to rob and then shot?

Defendant: No, sir.

\*\*\*

Defendant: I didn't think I killed the man, I shot him in the leg, I am sorry ....

Cash: We will ask you and your mother to read this ... and if you find it to be true and correct and given by you freely and voluntarily, without any promises, threats, or coercion of any kind ... we will ask both of you to initial the bottom right hand corner of the first three pages and both of you to sign your names along with the date and time of your signatures on the lines provided below at the end of your statement on page four.

On August 22, 1995, at 12:29 A.M., the defendant and his mother initialed each page and signed on the last page of this statement.

Officer Cash testified that, after the interview, the defendant accompanied the officers to the place he claimed to have hidden the gun. He confirmed that none was ever found.

Officer Cash acknowledged that although the defendant was only

4

fourteen years old, he did not take the defendant to juvenile court or to a juvenile court intake officer. He denied that the defendant had been sick just before the interrogation. Officer Cash remembered being at the apartment for less than thirty minutes and denied handcuffing the defendant or placing him in a marked patrol car. Officer Cash testified that the defendant had neither a foreign accent nor a speech impediment but recalled that Ms. Williams, who is from Jamaica, had an accent and expressed concerned about the situation. He stated that she had never requested an attorney.

Officer Cash testified that extensive interviews had been conducted but that no notes, video or audio tape recordings had been made. He acknowledged that a transcriptionist is generally used for a formal written statement, but that Sergeant Nichols had transcribed the statement in this instance. Officer Cash maintained that the answers of the defendant were transcribed verbatim.

Officer Cash conceded that he had testified incorrectly on direct examination that the police looked for the murder weapon after rather than before the defendant's statement. He acknowledged that the statement contained information about their search for the weapon. He also admitted that between the day of the shooting and taking the defendant into custody, he had developed a list of five other possible suspects. Although he had attempted to locate the others, Officer Cash recalled interviewing only one of the five. Officer Cash acknowledged that the defendant had not provided any facts that police did not know before the interview except for the identity of the shooter.

On redirect examination by the state, Officer Cash explained that the defendant did not become a suspect until after he had admitted shooting the victim.

5

He also corrected his earlier testimony about when he had looked for the murder weapon and confirmed that the defendant's mother was present during the entire interview. He also testified that the defendant was allowed to eat during the interrogation.

Dr. Wendy Gunther, a forensic pathologist with the Shelby County Forensic Center, performed the autopsy. She testified that the cause of death was either of the two lethal gunshot wounds to the back. She characterized the gunshot wound to the leg as no more than a flesh wound.

Gloria Williams, a defense witness, testified that she had lived in the United States for eleven years but that she and her husband, Barry Joe Williams, were originally from Jamaica. She stated she was living at Kingsgate Apartments at the time of the arrest and that her son, who was in the seventh grade, had failed some grades due to a speech problem.

Ms. Williams maintained that the two officers brought the defendant out of the bathroom, handcuffed him, and put him into an unmarked police car. She claimed that she never asked for an attorney and that the defendant simply "agreed to everything that they was asking him." Ms. Williams contended that the officers demanded that she "sign [the written statement] right here, right now, right there and that's what I did."

Ms. Williams, who could read English "a little bit," could not explain why she did not read the statement before signing, saying, "I just learned my lesson from that to always read." She maintained that her son had promised her that he did not shoot the victim. She claimed that although she was in the bedroom at the

6

time, she believed he was in a nearby room watching a Mike Tyson fight on television. On cross-examination, she acknowledged that the defendant had led officers to where the gun had been hidden but that it was not there.

The defendant, sixteen years of age at the time of trial, testified that he had difficulty reading and writing. He claimed he was at home on the night of the shooting and had asked his mother to order the Tyson fight on pay-per-view. He testified that the fight, scheduled to begin at 7:30 P.M., came on at 8:00 P.M. and lasted only eight or nine seconds. The defendant denied that he shot the victim. He maintained that he had instead gone directly to a place called the Honeycomb.

The defendant stated that he knew the other five suspects because they lived in Kingsgate Apartments. He denied knowing "Black" and claimed that the police showed him a picture of a man named Mario, who was supposed to be called "Black." He claimed that when he saw the photograph, he realized he did know him.

The defendant testified that when the police arrived, he was throwing up in the bathroom because he had been drinking that day. The defendant claimed that the officers placed him in handcuffs, searched his room and the bathroom, and then placed him in a marked police car. He contended that a uniformed officer drove him to the station. He testified that his mother had ridden in a separate car with Officers Cash and Nichols. He claimed that he was very nervous and thought he had been arrested when the officers began their interrogation. He admitted that he signed the waiver of rights form but claimed he had not read it and did not realize that he could have had a lawyer.

7

The defendant asserted that he had told the officers where a gun was supposed to be hidden and had taken them there.  He insisted that the gun belonged to Brodie Moore, one of the other suspects, and that he had seen it earlier that day.  He stated that when they got to Kingsgate to look for the hidden gun, it was not there.  The defendant denied that the written statement accurately reflected his actual responses to the questions, maintaining that "I don't know all those words. ... I couldn't tell them that."  The defendant denied shooting the victim.

On cross-examination, the defendant claimed that he had been told what to tell officers by Brodie Moore and had done so only to protect his family.  He denied knowing Brodie Moore well but did admit that he had seen him at the Honeycomb, a place where people go to drink, do drugs, and have sex.  The defendant admitted that he had smoked marijuana, used cocaine and drunk alcohol with Brodie Moore in the past.  The defendant admitted that he was familiar with the shortcut where the body was found but insisted that he had not been there on the day of the shooting.

In this appeal, the defendant contends that the proof did not show that the defendant shot and robbed the victim, only that the victim was shot and killed.  He maintains that there is absolutely no credible evidence that the victim was robbed and maintains that his confession is inherently unreliable.  He argues that his statement, which was obtained in violation of Rule 12(c) of the Rules of Juvenile Procedure, should not be used against him.  He also relies on Tennessee Code Annotated, section 37-1-127(c).  Interestingly, the defendant does not challenge the trial court's pre-trial ruling on the admissibility of his confession nor did he include the transcript of the hearing on the motion to suppress in the record on appeal.

8

Initially, Rule 12(c) pertaining to intake of juveniles in delinquent or unruly cases, provides that the officer "shall immediately" advise the child of his or her rights and obtain counsel for the child if the parents or guardian refuse or are unable to do so. Tenn. R. Juv. P. 12(c)(1), (2), (3). When a juvenile is taken into custody, the officers should "within a reasonable time" (1) release the child to his parents or guardian or (2) take the child before the juvenile court. Tenn. Code Ann. § 37-1-115. Subsequent provisions provide that "[a]n extra-judicial statement, if obtained in the course of the violation of this part ... shall not be used against [a child]." Tenn. Code Ann. § 37-1-127(c). This rule has been interpreted to mean that "§ 37-1-127(c) guarantees only that a juvenile's statements taken in violation of § 37-1-115 will not be used against him or her in a proceeding in juvenile court." State v. Lundy, 808 S.W.2d 444, 446 (Tenn. 1991) (citing Coyler v. State, 577 S.W.2d 460, 462 (Tenn. 1979)). Here, the defendant was tried as an adult. In consequence, the rule does not preclude use of the incriminating statement.

The defendant argues that the testimony of Officer Cash was so unreliable that no rational trier of fact could have returned a verdict of guilt. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

9

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. Robbery is aggravated when it is accomplished with a deadly weapon or serious bodily injury occurs. Tenn. Code Ann. § 39-13-402. A person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense: ... [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). The mental state of intentional is satisfied "when it is the person's conscious objective ... to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Here, the defendant confessed that he and "Black" were walking through a shortcut near a church when "Black" said, "Let's rob that man." The defendant admitted that he took the gun from "Black," pointed the weapon at the victim and, when the victim resisted by pushing the gun downward, fired a shot into the victim's leg. In our view, each of the elements of attempted aggravated robbery was satisfied. See Jackson v. Virginia, 443 U.S. 307 (1979). The jury was fully aware of the controversy surrounding the confession and, as was their prerogative, resolved portions of the dispute favorably to the state and some favorably to the defense. This court may not reweigh or reevaluate the proof. Liakas v. State, 286 S.W.2d 856 (Tenn. 1956).

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Judge

CONCUR:


(See Below)_____
Joe B. Jones, Presiding Judge


_____
Jerry L. Smith, Judge

The Honorable Joe B. Jones died May 1, 1998, and did not participate in this opinion. We acknowledge his faithful service to the Tennessee Court of Criminal Appeals, both as our colleague and as our Presiding Judge.