IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 6, 2004

## STATE OF TENNESSEE v. NATHANIEL LEE JACKSON & KENNETH L. JONES

**Appeal from the Circuit Court for Lewis County**
**No. 6308A & 6308B    Donald P. Harris, Judge**

_____

**No. M2002-02248-CCA-R3-CD - Filed June 7, 2004**

_____

The appellants, Nathaniel Lee Jackson and Kenneth Juqan Jones, both minors, were tried as adults in a non-jury trial and found guilty of aggravated kidnapping, evading arrest and aggravated robbery. Following a sentencing hearing, each received an effective sentence of twelve years. Both appellants argue that the juvenile court erred in transferring the case to circuit court. Appellant Jackson seeks a determination as to whether the judgment is void due to the failure of the trial court to have a detention hearing. Appellant Jones presents the following additional issues: (1) whether the evidence is sufficient on the charges of aggravated kidnapping and aggravated robbery; and (2) whether the trial court failed to adhere to applicable sentencing guidelines. After a thorough review of the record, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

John P. Cauley, Franklin, Tennessee for appellant, Kenneth L. Jones and William C. Barnes, Jr., Columbia, Tennessee, for appellant, Nathaniel L. Jackson.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; Ron Davis, District Attorney General; and Jeffrey Long, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

On June 14, 2001, four teenagers, including the appellants, escaped from New Hope Facility in Lewis County, Tennessee. That same day, Willadean Dobson, a sixty-nine-year-old employee of Keaton, Turner, and Spitzer law firm in Hohenwald, Tennessee, spent her lunch hour grocery shopping for her ninety-one-year-old mother. Her mother lived alone at 235 North Walnut Street in Hohenwald. When Mrs. Dobson finished her shopping, she traveled in her 1997 Cadillac to her mother's home to deliver the groceries. She entered through the front door, which was shut but unlocked. Her mother was at the beauty parlor getting a permanent when Mrs. Dobson dropped off the groceries. Mrs. Dobson took the groceries inside and set them down on a table. At that time, four individuals, "three blacks and one white," emerged from various rooms in her mother's house. Three of the individuals wore stockings over their heads, and one individual had a blue bandana around the lower half of his face. The individual with the blue bandana was also wearing a blue shirt with a white design on it.

The individuals yelled at Mrs. Dobson and forced her into a chair. They then began to duct tape her feet and her wrists together. She told the individuals that she did not have any money, so they carried her into a bedroom where they used twine and more duct tape to tie her wrists to the bedposts. After they added additional duct tape to her restraints, the "black boy in the blue shirt" stood near her holding a small hatchet. Mrs. Dobson described his actions as "being smart," hitting the hatchet against his hands in a threatening manner. The "white boy" had a hammer and was using it in the same threatening manner. The "white boy" asked if she could write them a check. The individuals then taped Mrs. Dobson's mouth shut with duct tape. The "white boy" with the hammer and the "black boy" with the hatchet appeared to be the leaders of the group.

The individuals left Mrs. Dobson in the bedroom tied to the bed while they went into the kitchen. After she heard them leave, she eventually managed to free herself from the bed and hop towards the telephone. While Mrs. Dobson was trying to get to the phone, she fell and broke her finger. She managed to get to the phone and call 911.

While at Mrs. Dobson's mother's house, the individuals took ten dollars from her mother's wallet, her purse, and her 1997 Cadillac. They also drank from a two-liter bottle of Coca Cola. As a result of being taped and tied up, Mrs. Dobson had bruises on her wrists. During the time she was being held captive, Mrs. Dobson was in fear for her life.

Dewayne Kilpatrick, the Lewis County Sheriff, was advised by dispatch of the situation, including information regarding the stolen Cadillac. He and Officer Kenny Prentice were able to follow the automobile for a period of time. After verifying that it was the stolen automobile, he activated his emergency equipment. At that time, the vehicle fled at a high rate of speed, traveling

over 100 miles per hour on several occasions and forcing several vehicles off the road. The suspects finally turned onto a dead end street. The individuals exited the vehicle and ran into the woods. The driver and front seat passenger were black males, while the back seat was occupied by a white male and a third black male. Sheriff Kilpatrick and Officer Prentice pursued the individuals on foot and were able to apprehend one of the suspects. The three remaining suspects were eventually apprehended and transported to Hohenwald City Hall. A blue bandana, blue shirt with white print, and stockings were recovered from the area around the vehicle.

Stefon Copeland, a sixteen-year old, was one of the individuals apprehended that day. He testified at trial that he, appellant Jones, and another individual planned to escape from the New Hope Facility.[1] The three later included Appellant Jackson in the plans when he told them that his grandmother's house was located in Hohenwald. Mr. Copeland initially thought that the Walnut Street home belonged to Appellant Jackson's grandmother, but realized differently when Appellant Jackson kicked in the door. According to Mr. Copeland, while Appellant Jackson was breaking-in to the home, the three other individuals hid in a shed on the property. Once they gained access to the house, Mr. Copeland went to the kitchen to find something to drink while Appellant Jackson rummaged through a closet where he found a suitcase containing a hatchet, duct tape, and twine. Mr. Copeland testified that Appellant Jackson was responsible for tying Mrs. Dobson up and that Appellant Jackson and Appellant Jones moved Mrs. Dobson to another room. Appellant Jones wore a bandana on his face while the three other individuals wore stockings over their heads. When the individuals left the home in the Cadillac, Appellant Jones and Mr. Copeland sat in the front seat, while Appellant Jackson and another individual were in the back seat. According to Mr. Copeland, Appellant Jones was the driver of the stolen vehicle.

Upon his return to Hohenwald, Lieutenant Greg Wise investigated the scene and took a statement from Mrs. Dobson. He was able to determine that the back screen door had been pried open and the back door had been kicked in. He noticed a large muddy footprint on the white part of the wooden door. He recovered a tack hammer, twine, cane, Pepsi bottle, hatchet, and black shirt from the home on Walnut Street. Lieutenant Wise also took several photographs of Mrs. Dobson's broken finger and the bruises on her wrists.

Lieutenant Wise interviewed all four suspects. They were all read their Miranda rights and indicated their understanding of those rights. Both Appellant Jackson and Appellant Jones signed waivers of their right to remain silent, but neither wished to speak with Lieutenant Wise. Appellant Jackson and Appellant Jones later both gave statements to Lieutenant Wise. Appellant Jones's statement reads:

> We got out of New Hope and started running. We all four found a house and kicked in the back door. We were there about three minutes when the woman came in. We tied her up with duct tape we got out of a shed earlier. I don't remember the string.

---

[1]This is a facility operated by the Tennessee Department of Children's Services.

-3-

We told her we wanted money.  She said she had to get it.  She said she would write a check.  We left, got in the Cadillac and left.  I got in behind the driver.

Appellant Jackson's statement, on the other hand, states that

I heard at New Hope that some other boys were going to run.  I heard they were going to Columbia and that's were I live, so I decided to go with them.  When we left, we ran for a while and cut across a field.  We saw two old ladies in a blue car, and the black guy with the gold teeth said, "Do you want to pull them out and get the car?"  We did not and hid in the shed.  We saw a police car go by.  Kenneth Jones started walking towards the house.  We tried the screen door at the back of the house and it was locked.  Kenneth picked up some hedge clippers and tried to pry the screen door and couldn't.  I took them and got it open.  I kicked in the door and Kenneth told the others to come on.

Kenneth got on the phone to call somebody and the others were looking for money and stuff.  Stefon found a five dollar bill in a black purse in the bedroom we tied the lady up in.  He also found some change in the purse and put it all in his pocket.  Kenneth said we'd wait on the women to come back and get their car.  We saw more police out front.  Kenneth was trying to call his sister when the police showed up.  Then the phone rang, but we didn't answer it.  Kenneth kept looking out the window.

Kenneth talked about tying the women up when they came back.  I looked in the bedroom closet and got some masking tape, duct tape and string.  There was a clock making noise and Kenneth was going to put it in the closet.  He found the hammer and hatchet.  Demarquis found a cane in the bedroom and took it.  Kenneth took his blue flags out of his pocket and put them on his face.  He found two nylon hose to [give to] Demarquis and me and a black socking cap to [give to] Stefon.

Kenneth heard someone pull up and he told us to get ready, the women are back.  Then he said, "No, it's someone waiting for her.  Damarquis had the cane, Stefon had the hammer, Kenneth had the hatchet.  Demarquis showed her the cane and said, "Sit down bitch," and she screamed.  She then asked, "What do you want?  What can I do for you?"

We told her to sit down, we're not going to hurt you.  I was holding the duct tape.  Kenneth said, "Tie her up."  Kenneth found a jump rope and started to tie her with it.  I put tape around her wrists; Kenneth duct-taped her feet together.  Kenneth asked her if she can walk and she says she can't, and Kenneth made her try.  She was making small steps.  Kenneth or Mackey, Demarquis, picked her up from behind and placed her on the bed.  Kenneth wrapped the string around her wrists and tied her to the bedpost.  I duct-taped the string to the bedpost.

-4-

She asked again, "What do you need?" and we said money. She said she didn't have any. She said her purse was in the car. Kenneth asked if she could write a check. She kind of laughed and said no. I said we can bring her purse in. She said she had to be at work in ten minutes. We said, "Why don't you call work and say you're sick?"

Stefon got the Pepsi out of the grocery bag and took a drink, then Mackey took a drink, then I took a drink. Kenneth got the car keys, he gave the keys to Mackey, and Kenneth said he was going back inside to talk to the lady to ask her about money. We then took off out the door after Kenneth asked the lady about the keyless entry button and asked about an alarm. He gave the keys to Stefon. I got in the back passenger side, Mackey was in the back driver's side, Stefon was the front passenger, and Kenneth was the driver. I identified the black shirt shown to me at city hall as mine.

## Procedural History

In January of 2002, the appellants were indicted by the Lewis County Grand Jury in a multi-count indictment on charges of escape from a penal institution, aggravated assault, aggravated burglary, two counts of aggravated kidnapping, aggravated kidnapping with a deadly weapon, felony evading arrest, and aggravated robbery with a deadly weapon.

A detention order filed August 7, 2001, reflects that on July 10, the parents of both appellants were present in court and indicated plans to retain counsel or submit affidavits of indigency to the juvenile court. The juveniles were ordered to be held in the custody of the Tennessee Department of Children's Services ("DCS") until August 28, 2001, the date of the next scheduled hearing.

The next entry in the technical record reflects that a transfer hearing was held on November 15, 2001. At the outset of the hearing, the parties stipulated to the testimony of Stella Mitchell, an employee of New Hope. Her testimony consisted of the factual basis for the escape charge. The parties also stipulated that Officer Prentice, if subpoenaed to testify, would testify that he and Sheriff Kilpatrick pursued the suspects in the stolen Cadillac at approximately 130 miles per hour. The remainder of the hearing consisted of testimony from various witnesses, including Mrs. Dobson, Lieutenant Wise, Lisa Morgan, Gerard Schwain, Annette Hardison, Ed Massey, Appellant Jackson, Donna Jones, Bryan Ryan, and Andre Martin.

Lisa Morgan, a team coordinator with DCS, described the various levels of DCS custody available to juveniles in Tennessee with Level One being the least restrictive and Level Four consisting of a "lockdown" facility. She testified that juveniles can be detained until their nineteenth birthday and that they can earn "good time" just like an adult at a rate of sixteen (16) days per month.

She did not think that Appellant Jackson had ever been to a Level Four facility. She knew that Appellant Jones was in custody for cocaine and marijuana charges as well as truancy.

Gerald Schwain, the DCS caseworker for Appellant Jackson, testified as to Appellant Jackson's history with DCS. Mr. Schwain met with Appellant Jackson three times for approximately an hour and a half total. He knew about Appellant Jackson's shoplifting and aggravated burglary charges. The shoplifting charge involved a pack of cigarettes while the aggravated burglary charges involved his parents. Appellant Jackson also has charges for being a runaway, violating probation, and being unruly. Since being held in custody at Taft Correctional Facility, Appellant Jackson has been in trouble for contraband, stealing, fighting, and threatening a staff member. Appellant Jackson has been in several private facilities including Middle Tennessee Mental Health and Vanderbilt Psychiatric Unit.

Annette Hardison, the DCS case manager for Appellant Jones, testified that Appellant Jones had several truancy charges, an unruly charge, an assault charge, and a disorderly charge as well as the cocaine and marijuana charges. She described Appellant Jones as being a runaway problem.

Ed Massey, a psychiatric nurse practitioner, was called to testify on behalf of Appellant Jackson. Mr. Massey had been working with Appellant Jackson on an almost weekly basis since September of 2000. Mr. Massey diagnosed Appellant Jackson with major depression and bipolar disorder and has treated him with various types of medication. Mr. Massey felt that as a result of the bipolar disorder, Appellant Jackson suffered periods where he is unable to make proper judgments. Mr. Massey believes that Appellant Jackson could become a productive member of society with the proper medication and counseling.

Appellant Jackson chose to testify at the transfer hearing. He claimed that he was doing well in school, but that he had gotten into trouble with cigarettes and stealing since he had been housed at Taft Correctional Facility. He also was able to express remorse for his actions.

Donna Jones, the mother of Appellant Jones, testified that his problems started at a young age with truancy, but that Appellant Jones was remorseful and wanted to go to college. Bryan Ryan, a teacher, also testified about Appellant Jones. He felt that Appellant Jones was doing well in the lock down facility, but was surprised when he heard of the details of the incident. Andre Martin, the Drug Abuse Resistance Education Officer for Columbia Police Department, also felt that Appellant Jones was extremely remorseful about the event.

After hearing the testimony at the transfer hearing, the trial court entered a transfer order on November 16, 2001, transferring both appellants to Circuit Court based on the fact that there were reasonable grounds to believe that: (1) the juveniles committed the delinquent acts as alleged; (2) the juveniles are not committable to an institution for the mentally retarded and mentally ill; and (3) the interests of the community require that the juveniles be put under legal restraint or discipline.

A bench trial was held on June 5, 2002. At the conclusion of the trial, the appellants were found guilty of three counts of aggravated kidnapping, evading arrest,[2] and aggravated robbery.

At a sentencing hearing in August, the trial court merged the three counts of aggravated kidnapping into one count. As a result, each appellant received twelve years as a standard offender with a violent release eligibility on the charge of aggravated kidnapping and twelve years as a standard offender with a standard release eligibility on the charge of aggravated robbery, to be served concurrently for an effective sentence of twelve years. Appellant Jackson received 11 months, 29 days for the misdemeanor charge of evading arrest and Appellant Jones received four years as a Range One, Standard Offender for the charge of felony evading arrest, to be served concurrently to the twelve-year sentences.

On appeal, Appellant Jones challenges the sufficiency of the evidence, his sentence, and the trial court's decision to transfer the case to Circuit Court. Appellant Jackson joins in Appellant Jones's argument that the trial court erred in transferring the case to Circuit Court. Additionally, Appellant Jackson argues that the trial court erred in not granting or allowing a detention hearing.

<u>Sufficiency of the Evidence</u>

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In the case herein, the appellants were charged with escape from a penal institution, aggravated assault, aggravated burglary, two counts of aggravated kidnapping, aggravated kidnapping with a deadly weapon, felony evading arrest, and aggravated robbery with a deadly

_____

[2]Appellant Jones was found guilty of felony evading arrest while appellant Jackson was found guilty of misdemeanor evading arrest.

-7-

weapon and the trial judge found them guilty of aggravated kidnapping, aggravated robbery, and evading arrest. On appeal, Appellant Jones argues that the evidence did not support the convictions for aggravated robbery and aggravated kidnapping. Essentially, Appellant Jones contends that the kidnapping of Mrs. Dobson was incidental to the robbery and that the trial court committed reversible error in denying his motion to dismiss the kidnapping counts based on State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The State argues that Appellant Jones's reliance on Anthony is misplaced and that it is clear that Appellant Jones "committed separate offenses of aggravated robbery and aggravated kidnapping."

In Anthony, the Tennessee Supreme Court stated that before a defendant may be convicted of a kidnaping charge, the trial court must determine whether the confinement, movement, or detention [involved in the individual's case] is essentially incidental to the accompanying felony and if not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction. Id. at 306. In addition, our supreme court instructed "that one method of resolving this question is to ask whether the defendants conduct 'substantially increased [the] risk of harm over and above that necessarily present in the [attending] crime . . . itself.'" Id. (quoting State v. Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)).

In State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), the supreme court further refined the approach to be taken when analyzing these issues. See id. at 535. The reviewing court must ascertain "whether the movement or confinement was beyond that necessary to consummate the act of" the accompanying offense. Id. "If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. The Dixon court clearly stated that the intent is not to provide a defendant with "a free kidnapping merely because he [or she] also committed" the primary offense, but rather is merely to "prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of" the accompanying crime. See id. at 534.

We determine herein that Appellant Jones's detention of Mrs. Dobson was not just incidental to his robbery of her money, her mother's money, and her car. The individuals involved did not merely control Mrs. Dobson by threatening her with a hatchet and tack hammer, but instead bound her wrists and ankles with duct tape, immobilizing her for a period of time beyond the period of time in which the robbery took place. Moreover, the individuals, including Appellant Jones, moved Mrs. Dobson from the kitchen to the bedroom, bound Mrs. Dobson to the bedpost in her mother's home, and duct taped her mouth shut after they stole money from her mother's purse and drank from a two liter bottle of Pepsi but before they fled the crime scene in her Cadillac, indicating that they did not immobilize her merely to allow completion of the robbery. See, e.g., State v. William Rhea Jackson, No. M2002-00762-CCA-R3-CD, 2003 WL 1563663, at *15 (Tenn. Crim. App. at Nashville, Mar. 27, 2003) (finding that the defendant's kidnapping conviction was constitutional where the defendant's action of binding his victim after his completion of several crimes indicated that the defendant bound his victim in order to facilitate flight and avoid detection); cf. Anthony, 817 S.W.2d

at 307 (noting that the defendant's detention of three restaurant employees during the robbery of the restaurant was incidental to the robbery where the defendant held the employees at gunpoint during the commission of the offense). Furthermore, as the Dixon court noted when revisiting State v. Anthony, "any restraint in addition to that which is necessary to consummate [the accompanying felony charge] may support a separate conviction for kidnapping." See Dixon, 957 S.W.2d at 534-35. We determine that the act of binding Mrs. Dobson with duct tape and tying her to the bedpost constitutes a form of restraint additional to the restraint necessary to complete the commission of the robbery.

Turning next to the second prong of our analysis, we must now determine whether this additional restraint "(1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. at 534. As noted above, Appellant Jones and the other individuals bound Mrs. Dobson's wrists and ankles shortly after she entered the residence. After they had collected some cash from her mother's purse, drank some of her mother's Pepsi and asked her whether she had more money, Appellant Jones and the others carried Mrs. Dobson to the bedroom and tied her to the bedpost. We conclude that further binding Mrs. Dobson by tying her to the bedpost and duct taping her mouth shut hampered her ability to escape or summon help; more patently, the movement decreased the intruders' risk of detection. Furthermore, the actions of binding Mrs. Dobson's ankles and wrists with duct tape and taping her mouth shut rendered the victim defenseless to any assaults that the intruders might have inflicted upon her. Mrs. Dobson suffered an increased risk of harm by being bound. In fact, she fell and broke her finger in an attempt to free herself and summon help. Accordingly, we conclude that this confinement increased the risk of harm to the victim. Thus, Appellant Jones's convictions for aggravated robbery and aggravated kidnapping do not violate due process, and this issue therefore lacks merit.

Transfer to Circuit Court

Appellant Jackson contends that the juvenile court erred in transferring him to stand trial as an adult because his record and the history of his mental illness, coupled with the facilities available to juveniles in Tennessee, made him amenable to treatment as a juvenile. Specifically, he argues that the juvenile court improperly relied on his juvenile record to justify the transfer. Appellant Jones argues that his "[juvenile] record fails to demonstrate that the defendant ever knowing waived his right to counsel or was ever appointed counsel during any of the proceedings connected to his delinquent acts." Further, Appellant Jones argues that his juvenile record did not justify the transfer. The State counters that the transfer was proper because the juvenile court "properly relinquished jurisdiction as authorized by statute."

A child[3] charged with a criminal act will be treated as an adult if the court finds that there are reasonable grounds to believe that: "(A) [t]he child committed the delinquent acts as alleged; (B)

---

[3]Tennessee Code Annotated section 37-1-134(a)(1) provides that a child does not have to be age 16 if, as here, the child was charged with aggravated robbery and aggravated kidnapping.

[t]he child is not committable to an institution for the developmentally disabled or mentally ill; and (C) [t]he interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a)(4)(A)-(C). When making the determination of whether or not to transfer the juvenile to be dealt with as an adult, the juvenile court must consider the following factors: "(1) [t]he extent and nature of the child's prior delinquency records; (2) [t]he nature of past treatment efforts and the nature of the child's response thereto; (3) [w]hether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (4) [w]hether the offense was committed in an aggressive and premeditated manner; and (5) [t]he possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state. . . ." Tenn. Code Ann. § 37-1-134(b)(1)-(6).[4]

On appeal, this Court must determine whether there were reasonable grounds for the juvenile court to believe that the criteria listed in Tennessee Code Annotated section 37-1-134(a)(4) were present in this case. See State v. Strickland, 532 S.W.2d 912, 920 (Tenn. 1975), cert. denied, 429 U.S. 805 (1976), superceded by statute as stated in State v. Lundy, 808 S.W.2d 444 (Tenn. 1991); State v. Layne, 546 S.W.2d 220, 224 (Tenn. Ct. App. 1976). At the conclusion of the hearing the juvenile court found that there were sufficient grounds to transfer Appellant Jackson and Appellant Jones to the criminal court to be tried as adults based upon the statute. The judge noted that there was "no question that these young men committed the crime" and considered the treatment efforts that have gone on in the past "especially in regards to Mr. Jackson." The trial court acknowledged that "there seems to be evidence that this boy [Appellant Jackson] has some problems, that he's got some medical problems, mental problems maybe chemical disorders," but that the one to two years he could potentially be in state custody would not make "much head-way" in treating his condition. Despite these problems, the trial court did not feel like he could commit Appellant Jackson to a "mentally ill facility." Further, the trial court felt that the long-range monitoring available in the adult court system would be beneficial to both appellants because there was not enough "time to turn these boys around" when they have had seventeen years to do so on their own. The trial court observed the fact that both appellants had "no inclination to respect the rights and the welfare of others."

The testimony concerning the commission of the offense was similar to that presented at trial and included the statements of both appellants. We agree with the juvenile court that, at the time of the transfer hearing, there were reasonable grounds to believe that Appellant Jackson and Appellant Jones committed the offenses.

Additionally, there is no indication in the record that Appellant Jackson or Appellant Jones were so developmentally disabled or mentally ill that they were committable to an institution. While Appellant Jackson was found to have some type of bipolar disorder, he was evaluated by a mental health professional prior to the transfer hearing and found competent to stand trial. There are several previous cases wherein courts have permitted transfers involving juveniles for whom evidence suggested that they were suffering from mild mental retardation, depression with psychotic features, bipolar disorder, post-traumatic stress disorder, or a treatable drug problem. See, e.g., State v.

---

[4]Subsection (6) involves consideration of gang related conduct and is not relevant here.

-10-

Howell, 34 S.W.3d 484, 497 (Tenn. Crim. App. 2000); State v. Williams, 784 S.W.2d 660, 663 (Tenn. Crim. App. 1989); State v. Derrick Bryant, No. E2000-01835-CCA-MR3-CD, 2001 WL 1187916, at *6 (Tenn. Crim. App. at Knoxville, October 9, 2001), perm. to appeal denied (Tenn. 2002); State v. Joshua McDaniel, No. 03C01-9605-CC- 00178, 1997 WL 304194, at *2 (Tenn. Crim. App. at Knoxville, June 5, 1997).

Appellant Jackson's and Appellant Jones's primary objection to their transfer to criminal court is their belief that they should have been extended another opportunity for rehabilitation through the juvenile system. In support of Appellant Jackson's position, he points to his lack of an extensive prior record and history of mental illness. At the transfer hearing, testimony was presented concerning Appellant Jackson's prior history, the programs and facilities available if the juvenile court were to retain jurisdiction, and his mental illness. Weighed against these factors, however, are the seriousness of the charges, the nature of the offenses, and the manner in which the offenses were carried out. Taking into consideration also that Appellant Jackson was sixteen at the time of the offenses and seventeen at the time of the transfer hearing, we agree with the juvenile court's finding that the interests of the community required that Appellant Jackson be committed to the adult system and treated as an adult.

The testimony as to Appellant Jones indicated that he had a long history of involvement in the juvenile justice system, including four separate occasions where he was placed in the custody of DCS. While he had been released from custody at one point and performed successfully on probation, the trial court took into account his age at the time of the transfer hearing,[5] the seriousness of the charges and the nature of the offenses. Appellant Jones argues that the trial court failed to acknowledge that his juvenile record did not demonstrate that his constitutional rights were "observed" and that the trial court should therefore not have considered the juvenile record "reliable." Appellant Jones does not complain of specific instances of constitutional violations. He merely challenges his juvenile record as a whole. Contrary to his assertions, the juvenile record included as an exhibit at the transfer hearing indicates that he was represented by counsel during various juvenile proceedings. Further, the juvenile record contains more than ten (10) "acknowledge of rights" forms signed by both Appellant Jones and his parent or guardian as well as petitions that were served on Appellant Jones prior to his various court appearances. Any challenge to the validity, reliability, or constitutionality of his prior juvenile adjudications is not properly addressed in this appeal as those crimes and offenses are not within our jurisdiction in an appeal from the criminal convictions challenged herein. Thus, we agree that the interests of the community required Appellant Jones to be committed to the adult system and treated as an adult.

We conclude that the evidence offered at the transfer hearing was more than sufficient for the juvenile court to have reasonable grounds to believe that Appellant Jackson and Appellant Jones had committed the offenses, that they were not committable, and that the community's interest required them to be put under legal restraint or discipline. This issue is without merit.

---

[5]At the time of the transfer hearing, Appellant Jones was only eight months away from his eighteenth birthday.

## Failure to Hold a Detention Hearing

Without citation to the record, Appellant Jackson argues that he was denied a detention hearing in violation of Rules 6 and 15 of the Juvenile Rules of Procedure. The State argues that the appellant waived the issue by failing to ensure an adequate record for review on appeal.

Appellant Jackson's argument, in its entirety, merely claims that "clearly in the case at hand, the juvenile in question was denied said detention hearing." This cursory argument fails to make any citations to the record. Accordingly, he has waived this issue on appeal. See Tenn. R. App. P. 27(a)(7); Tenn R. Crim. P. 10(b).

Further, there is no proof in the record that Appellant Jackson was denied a detention hearing. As correctly pointed out by the State, the record contains a detention order in which Appellant Jackson's parents indicated their intent to retain counsel for their son. The order also indicated that the matter was to be continued until August 28, 2001. After the detention order, the record is devoid of any additional information regarding a detention hearing. The next activity in the matter took place in November when the trial court held a transfer hearing. The record does not indicate that Appellant Jackson sought a detention hearing that was later denied. The record is insufficient to review Appellant Jackson's allegation that the trial court failed to conduct a detention hearing. It is the duty of the Appellant to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b). "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Without any proof in the record as to what events actually transpired, we are unable to address this issue.

Even if we determined that Appellant Jackson had not waived this issue, we conclude that the issue nevertheless lacks merit. Punitive pre-trial detention is prohibited by due process; remedial detention, however, is permitted provided the individual is afforded sufficient procedural due process. See State v. Johnson, 980 S.W.2d 414, 421 (Tenn. Crim. App. 1998). Appellant Jackson was already confined in a juvenile penal institution on a previous offense prior to his escape. Thus, there was no procedural due process violation.

## Sentencing

Finally, Appellant Jones claims that the trial court erred in sentencing. Specifically, he argues that the trial court failed to follow sentencing procedures because the trial court improperly applied enhancement factors. The State responds that the evidence does not preponderate against the sentence imposed.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. §

40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

Turning more specifically to the facts of this case, Appellant Jones was convicted of aggravated kidnapping, evading arrest, and aggravated robbery. Aggravated kidnapping is a Class B felony, so the range of punishment is eight (8) to twelve (12) years. Tenn. Code Ann. § 40-35-112(a)(2). Additionally, aggravated kidnapping is a violent felony, so the release eligibility is 100%. Tenn. Code Ann. § 40-35-501(i)(2). Evading arrest is a Class D felony, so the range of punishment is two (2) to four (4) years. Tenn. Code Ann. § 40-35-112(a)(4). Finally, aggravated robbery is a Class B felony, so the range of punishment is eight (8) to twelve (12) years. Tenn. Code Ann. § 40-35-112(a)(2). Thus, the trial court should have started with the presumptive sentence for each offense, enhanced the sentence within the range for any enhancement factors, and then reduced the sentence within the range for any mitigating factors.

The trial court sentenced Appellant Jones to twelve years for aggravated robbery as a Range I, Standard Offender, twelve years for aggravated kidnapping as a Range I, Violent Offender, and four years for evading arrest as a Range I, Standard Offender. The trial court ordered the sentences to be served concurrently.

In imposing Appellant Jones's sentence, the State proposed several statutory enhancement factors and the appellant proposed several mitigating factors. After listening to the proof, the trial court found several enhancement factors to be applicable: (1) that Appellant Jones was a leader in the commission of an offense involving two or more criminal actors, Tenn. Code Ann. § 40-35-114(3); (2) the victim was particularly vulnerable because of her age, Tenn. Code Ann. § 40-35-114(5); (3) the crime was committed under circumstances under which the potential for bodily injury to the victim was great, Tenn. Code Ann. § 40-35-114(17); and (4) Appellant Jones had no hesitation

about committing a crime when the risk to human life was high,[6] Tenn. Code Ann. § 40-35-114(10).

The trial court explained its ruling as follows:

The court has considered the pre-sentence reports that were filed in this case, along with the exhibits relating to Mr. Jones' and Mr. Jackson's juvenile records, the statement of the lady who treats the victim, Mrs. Dobson, as well as the testimony of the persons who have treated Mr. Jackson in this case and, of course, the testimony of the families of both of these defendants. I've also given a great deal of consideration to the purposes and considerations of sentencing as set forth in our statute, as well as the mitigating and enhancing factors that are contained in the statute.

With regard to Mr. Jones, I find there are two enhancing factors that apply to him. Number two, in that he was a leader in the commission of this offense and it involved two or more criminal actors applies to him. I further find in this case, and I guess it's a combination of factor four and sixteen applies.[7] They left this lady tied up, and if she had been a twenty-five year old, I might feel differently about it, but when you have a lady of her age and you leave her tied up or taped up as they did, then that certainly is a circumstance under which the potential for bodily injury to a victim is great.

And, in fact, bodily injury occurred in this case, in that she did fall as she was attempting to unbind herself, and I think as I recall, broke a finger. And then, of course, the feeling of helplessness is greater with a person of her age, and think that also contributed to the suffering that she has experienced and will continue to experience for the remainder of her life. And I find that applies to both of these defendants.

. . . .

I have considered the mitigating factors that apply, or could be said to apply. One, of course, is obvious, and that is their age, and if this were a simple theft offense, I might give that a great deal of weight, but even young people know not to injure or threaten injury to people with deadly weapons. And, so I don't think - - it either doesn't apply or it's entitled to very little weight.

---

[6]This enhancement factor applied only to Appellant Jones's conviction for evading arrest.

[7]2002 Tennessee Public Acts, Chapter 849, section 2(c), added subsection (1) to Tennessee Code Annotated section 40-35-114, relating to acts of terrorism, and redesignated former subsections (1) to (22) as (2) to (23). The trial court apparently referred to enhancement factors during the sentencing hearing by their old designations. Thus, the trial court's references to factors four (4) and sixteen (16) actually correspond to factors five (5) and seventeen (17).

-14-

. . . .

I think that the proper sentence in each of the aggravated kidnapping and the aggravated robbery cases - - in the Department of Corrections as a Range I standard offender; in the aggravated kidnapping, as a Range I offender, twelve years, violent offender.

I think of the evading arrest in Mr. Jones' case the proper sentence - - and I further find with regard to it that number ten enhancing factor applies, that he had no hesitation about committing a crime when the risk to human life was high. Certainly, the risk to other people on that road that day was a danger, and as I recall, there was a van that not only was run off the road, but it went airborne and hit a tree or post or something and, certainly, those people could have been injured. The proper sentence in that case is four years in the Department of Corrections as a Range I standard offender.

I find that all sentence should be served concurrently with one another. And I recommend that they be retained at the Taft Youth Center, if that's possible, until they reach the age of majority of eighteen years.

After a de novo review, we cannot conclude that the evidence preponderates against the trial court's decision to impose an effective twelve-year sentence. The proof indicates that Appellant Jones was the leader of the group according to the testimony of both Mr. Copeland and the statement of Appellant Jackson. The victim was a sixty-nine year old woman who injured herself while trying to call for help. The victim was tied up and taped up and left in the bedroom of her elderly mother's home. The amount of evidence needed to prove vulnerability of the victim need not be extensive in order for the court to apply the enhancement factor found in Tennessee Code Annotated section 40-35-114(5). See State v. Poole, 945 S.W.2d 93 (Tenn. 1997). Further, Appellant Jones was the driver of the stolen Cadillac who engaged in a high-speed chase attempting to evade authorities, endangering the lives of countless other drivers and passengers on the roads of Lewis County.

After reviewing the application of the preceding enhancement factors, we conclude that the evidence does not preponderate against the trial court's decision to impose an effective twelve-year sentence on Appellant Jones. Accordingly, we affirm the sentence imposed by the trial court.

Conclusion

After a thorough review of the record, we find no reversible error. Accordingly, the judgment of the trial court is affirmed.

JERRY L. SMITH, JUDGE

-15-