# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 5, 2008 Session

## STATE OF TENNESSEE v. NICHOLAS FLETCHER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-08627     James C. Beasley, Jr., Judge**

---

**No. W2007-02118-CCA-R3-CD  - Filed June 25, 2009**

---

Following a jury trial, Defendant, Nicholas Fletcher was found guilty of first degree felony murder, attempted especially aggravated robbery, a Class B felony, and aggravated assault, a Class C felony. Defendant was sentenced as a Range I, standard offender, to life imprisonment with the possibility of parole for his felony murder conviction, eight years for his attempted especially aggravated robbery conviction, and three years for his aggravated assault conviction. The trial court ordered Defendant to serve his sentences concurrently for an effective sentence of life with the possibility of parole. On appeal, Defendant argues that (1) the trial court erred in denying his motion to suppress; (2) the prosecutor engaged in prosecutorial misconduct during the cross-examination of Cordareyes Torry; and (3) the cumulative effect of these errors denied Defendant his constitutional right to a fair trial. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Ryan B. Feeney, Selmer, Tennessee, for the appellant, Nicholas Fletcher.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Michelle Parks, Assistant District Attorney General; and James Wax, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Background

Danetta Alothmani testified that she and the victim, Ali Alothmani, had been married for five years when the offenses occurred. The victim worked as a store clerk in the convenience store owned by his brother, Abdo Ahmed. Ms. Alothmani last saw the victim on the morning of August

23, 2005, and she learned of his death the following morning from a friend. Ms. Alothmani identified a photograph of the victim as her husband.

Abdo Ahmed testified that he and his brother, the victim, were from Yemen. Mr. Ahmed said that he owned a convenience store, the Linc Minimart, which was located in Memphis. Around 9:30 p.m. on August 23, 2005, Mr. Ahmed stepped outside the store for a minute. Two men approached him with the lower half of their faces covered with a white cloth. The men pushed Mr. Ahmed back into the store, and one of the men held a gun to Mr. Ahmed's head. The victim, who had been cleaning the back of the store, walked toward the front door when he heard the noise. Mr. Ahmed stated that he tried to calm down the men, and he told them that he would give them money. Before he could do so, however, the man with the gun fired two shots, striking the victim. The men ran out of the store, and Mr. Ahmed called the police.

On cross-examination, Mr. Ahmed said that he could not positively identify the assailants because he could only see their eyes. Mr. Ahmed stated that the offenses occurred "so fast," and the men had turned him around so that his back was to them. Mr. Ahmed said, however, that he knew Defendant prior to the offense because Defendant and his father frequently shopped at his store. Mr. Ahmed said that he only saw two assailants and acknowledged that he would not have been able to see a third person on the sidewalk after he was pushed into the store. On redirect examination, Mr. Ahmed reiterated that he only saw two men leave the store.

Larry Jones testified that he resided near the Linc Minimart and shopped at the store every day. Mr. Jones stated that on August 23, 2005, he left the store around 9:00 p.m. After he had walked approximately twenty yards, three men ran past him. Mr. Ahmed ran out of his store and began yelling. Mr. Jones realized "something was going on" and turned to observe the running men again. Mr. Jones noticed that one of the men had a gun and what appeared to be a bandana tied around his neck. He did not see bandanas on either of the other men. Mr. Jones could not positively identify any of the men but described them as "teenagers." On cross-examination, Mr. Jones stated that he had not heard gunshots that night.

Antonio Lampkins testified that he was living at the Southern Oaks Apartments in Memphis in August 2005. Mr. Lampkins said that he had grown up with Defendant. Mr. Lampkins went to Lamario Hill's apartment complex on August 23, 2005, to play basketball with Mr. Hill, Defendant, and two other men. Later that night, Mr. Lampkins, Mr. Hill and Defendant played video games in Mr. Hill's apartment. Mr. Lampkins said that Mr. Hill suggested that the group rob the Linc Minimart, and Defendant responded, "Okay."

Mr. Lampkins, Defendant, Mr. Hill, and another man whose name Mr. Lampkins did not know walked toward the store. Mr. Lampkins said that he left the group at some point and returned home. Mr. Lampkins said that he did not want to rob the store because he "already had a job and stuff." Mr. Lampkins said that he did not see the three men again that night.

On cross-examination, Mr. Lampkins acknowledged that he was not charged in connection with the offenses. Mr. Lampkins said that he did not remember initially telling Officer Helldorfer that Defendant was not involved in the incident.

Dr. Marco Ross testified that he is a forensic pathologist with the Shelby County Medical Examiner's Officer. Based on the autopsy results, Dr. Ross stated that the cause of the victim's death was a gunshot wound to the chest. The bullet passed through the victim's chest wall, perforated his heart, and ultimately lodged in the abdominal cavity. Dr. Ross said that the medium-caliber bullet was fired from either a .38 or .9 mm weapon. Dr. Ross stated that the weapon was not discharged at close range, but he could not determine how far away the shooter was standing from the victim when the victim was shot.

Officer Tim Monistere with the Memphis Police Department was the first officer to arrive at the Linc Minimart on August 23, 2005. Officer Monistere met Mr. Ahmed at the store's front door and ascertained that an individual had been shot. Officer Monistere entered the store and saw the victim lying face down on the floor. Officer Monistere testified that the victim was unresponsive at that time. Officer Monistere found an open pocket knife on the floor next to the victim, and he placed the knife on top of the counter. On cross-examination, Officer Monistere stated that the knife had been within the victim's reach.

Sergeant Ronald Collins with the Memphis Police Department interviewed Mr. Lampkins at approximately 3:45 p.m. on August 25, 2005. Sergeant Collins testified that Sergeant Helldorfer had read Mr. Lampkins his Miranda rights earlier that afternoon. Mr. Lampkins was accompanied by his mother, Lizzie Carter. Shortly after the interview began, Mr. Lampkins told Sergeant Collins that Mr. Hill and Defendant had been involved in the incident. Sergeant Collins said that Mr. Lampkins gave a written statement at 8:07 p.m. Mr. Lampkins read over his statement, acknowledged that it was correct, and signed it.

On cross-examination, Sergeant Collins said that the investigating officers learned about Mr. Lampkins from Cordareyes Torry who spoke with one of the police officers at the scene on the night of the incident. Sergeant Collins stated that Mr. Torry was transported to the police station later that night, and he provided the officers with the names of the individuals involved in the offenses.

On redirect examination, Sergeant Collins said that Mr. Torry also named Mr. Hill and Defendant as participants in the offenses. On recross-examination, Sergeant Collins stated that he could not remember Mr. Torry mentioning any other names. He acknowledged that he did not take any notes during his conversation with Mr. Torry. Sergeant Collins clarified that Mr. Torry said that he saw four individuals walking toward the store that night, but he did not know the names of the other two men.

Sergeant T. J. Helldorfer with the Memphis Police Department testified that he served as the case coordinator during the investigation of the offenses. Sergeant Helldorfer said that an individual, later identified as Mr. Torry, told the investigating officers that Mr. Hill and Defendant had been

involved in the incident. Defendant, a juvenile, was arrested on August 25, 2005, and brought to the police station at approximately 6:00 p.m. along with his mother, Paula Fletcher. Sergeant Helldorfer said that Defendant was read his Miranda rights prior to his interview, and Defendant and his mother executed a written waiver of those rights. Mr. Hill and Mr. Lampkins were also being interviewed that night in separate rooms.

Sergeant Helldorfer stated that Defendant gave approximately seven varying descriptions of the sequence of events leading up to the offenses. His statement was reduced to writing at approximately 8:00 p.m. and signed by both Defendant and Ms. Fletcher.

Defendant's statement was introduced as an exhibit at trial and read to the jury. In his statement, Defendant stated that he was present at the Linc Minimart when the victim was shot by Mr. Hill. Defendant said "Treyvaughn," Mr. Hill's cousin, was also present. Defendant said that Mr. Hill was wearing a white t-shirt, dark colored jeans, plus a white t-shirt over the lower half of his face. Mr. Hill carried a chrome and black .357 revolver, and Defendant heard three gun shots. Defendant said that he and Treyvaughn also had covered their faces with white t-shirts. Defendant described the incident as follows:

> I met up with Treyvaughn, Mario, and Antonio Lampkins over [at] Betty's house on Hodges St. We played the game for a minute[,] then Mario came and said he knew a quick way to make money and he made the plan up. The plan was to go to the store by the liquor store and rob it. He said he was going to put the gun to his head and me and Treyvaughn was going to go to the cash register and get the money. Then we were going to run to Mario's house on Hodges [Street]. Then Mario showed me the gun. He hid it on his right side. We walked down Boston [Street] and walked up to the store. Antonio walked off to Mahummad's store on Felix because he said he didn't want to have anything to do with it. Mario said he was fixing to run in. Then he ran in and shoved the clerk and put the gun to the clerk's head. Me and Treyvaughn came into the door and we heard gunshot. So, we started running down Boston [Street] to Baltimore over [to] Brenda Cole's house. Then from there I went to the house.

Defendant said that "Betty" was Mr. Hill's mother, and Brenda Cole was a relative of Defendant's. Defendant stated that Mr. Lampkins called him the next morning around 11:00 a.m. Defendant told Mr. Lampkins that "Mario ran into the store [and] before we could get in he opened fire on one of the clerks . . . and me and Treyvaughn took off running." Defendant told Sergeant Helldorfer that "[i]t wasn't meant to go like that and [he was] sorry that the man in the store got shot."

On cross-examination, Sergeant Helldorfer denied that he threatened Defendant at any point during the interview. Sergeant Helldorfer acknowledged that he told Defendant that he was going to jail because Defendant was under arrest at the time of the interview. Sergeant Helldorfer said that he did not initially believe that Mr. Lampkins was telling the truth when Mr. Lampkins said that

neither he nor Defendant were involved in the offenses. However, contrary to Mr. Torry's statement, Sergeant Helldorfer said that he ultimately concluded that Mr. Lampkins was not present at the store when the shooting occurred based on Mr. Hill's and Defendant's statements. Sergeant Helldorfer acknowledged that Mr. Lampkins gave varying descriptions of the events that night and the extent of his role in the commission of the offenses before he executed his written statement. Sergeant Helldorfer stated that the bullet recovered from the victim's body was not submitted for testing because a weapon was never found. Sergeant Helldorfer said that no DNA evidence was found, and the fingerprints taken from the store did not match Defendant's. Sergeant Helldorfer acknowledged that Defendant's father, Charles Dale, was present at the police station when Defendant's statement was taken, but only one parent was allowed to be present in the interview room. Sergeant Helldorfer denied that Ms. Fletcher asked that Mr. Dale be allowed to sit in on Defendant's interview instead of her. Sergeant Helldorfer said that if she had so requested, the interview would have stopped until Defendant's father was present. Sergeant Helldorfer said that Defendant's father was permitted to visit with Defendant after Defendant had executed his written statement.

The State rested its case-in-chief, and Defendant put on his defense. Paula Fletcher, Defendant's mother, testified that Defendant was seventeen years old at the time of the offenses. Ms. Fletcher said that police officers came to her home and told her that Defendant was being charged with murder. Ms. Fletcher told the officers that she needed to call family members, but they told her she had to come to the police station immediately. Ms. Fletcher said that she waited approximately thirty minutes at the police station before she was allowed to see Defendant who was in an interview room with two investigators. Ms. Fletcher said that she was scared and nervous, and she was not given the opportunity to speak to Defendant alone before the interview began. The officers told Ms. Fletcher that Mr. Dale had arrived at the police station, but they did not tell her she could allow him to take her place during the interview.

Ms. Fletcher said that Defendant repeatedly told Sergeant Helldorfer that he did not commit the offenses, but Sergeant Helldorfer did not believe Defendant. Ms. Fletcher said that Sergeant Helldorfer left the room several times during the interview. Ms. Fletcher asked Sergeant Helldorfer if Mr. Dale could be present, and Sergeant Helldorfer responded that "he was trying to get a statement," and that Mr. Dale could come into the interview room after Defendant executed his statement.

On cross-examination, Ms. Fletcher acknowledged that she signed the Miranda waiver form and that Defendant agreed to give a statement. Ms. Fletcher said that she knew Mr. Lampkins and Mr. Hill, but she did not know Mr. Torry. Ms. Fletcher said that she did not read all of Defendant's statement despite her initials on each page because she felt that Sergeant Helldorfer was pressuring her. Ms. Fletcher acknowledged that Sergeant Helldorfer did not threaten her, it "was just the tone of [his] voice."

Charles Dale, Defendant's father, testified that after he arrived at the police station on August 25, 2005, he asked the investigating officers if he could be present during Defendant's interview.

The officers told Mr. Dale that "they didn't need [him] back there right now." Mr. Dale said that he was allowed to see Defendant after he had given his written statement.

Cordareyes Torry testified that he was currently incarcerated on drug and theft charges. Mr. Torry said that on August 25, 2005, at approximately 9:30 p.m., he and Defendant were walking behind Mr. Hill, Mr. Lampkins, and another individual. Mr. Torry said that the group was going to the liquor store. The three men went into the Linc Minimart while he and Defendant stood outside the liquor store talking. Mr. Torry said that he heard the other three men discuss robbing the Linc Minimart as they walked toward the store, but he and Defendant did not participate in that conversation. Mr. Torry heard gunshots approximately five minutes later. Mr. Torry said that the three men ran away from the convenience store, and he and Defendant ran in the opposite direction. Mr. Torry said that he returned to the store approximately three or four minutes later and spoke with the investigating officers.

Mr. Torry said that the police officers interrogated him at the police station later that night, and the three officers kept saying that he and Defendant were involved and that Defendant shot the victim. Mr. Torry acknowledged that he gave a written statement implicating Defendant in the offense. Mr. Torry explained, however:

> [T]hey was [sic] just drilling me and trying to make it seem like that [Defendant] was involved and if I don't tell them this, I'm going to go, you know, get time with them, and just, you know, how they try to interrogate you and do, you know.

Mr. Torry said that his statement was taken at approximately 3:00 a.m. after he had been at the police station for several hours. Mr. Torry's statement was introduced as an exhibit at trial. Mr. Torry said that the portion of his statement in which he said that Defendant was involved in the shooting was not true and reiterated that Defendant did not participate in the offenses. Mr. Torry denied that anyone had threatened him in connection with his testimony at trial, and he wanted to testify because Defendant was innocent of the charged offenses.

On cross-examination, Mr. Torry said that he did not remember telling the investigating officers that he heard Mr. Lampkins say, "I hope it [sic] ain't [sic] anybody in the store" and that Defendant responded that he did not care. Mr. Torry acknowledged that the prosecutor talked to him in the Shelby County Jail, and that he told the prosecutor that he was afraid because people were threatening him. Mr. Torry explained that he was referring to Mr. Hill's brother. Mr. Torry denied that he lied to the police when he gave his statement, but "[t]hey just put it in they [sic] own words." Mr. Torry acknowledged that he knew Mr. Hill but that Mr. Hill's name was not mentioned in his statement. Mr. Torry stated, however, that Mr. Lampkins, Mr. Hill, and another man went into the store shortly before the shooting. Mr. Torry denied that he told the prosecutor that he did not know who went into the store.

The State called Officer William D. Merritt with the Memphis Police Department as a rebuttal witness. Officer Merritt testified that he investigated the scene of the shooting on August

23, 2005. Officer Monistere told him that he had spoken with an individual who said that he had knowledge of the events leading up to the commission of the offenses. Officer Merritt said that Mr. Torry voluntarily came to the police station to give a statement. Officer Merritt stated that Mr. Torry was not read his Miranda rights because he was a witness, not a suspect. Officer Merritt read Mr. Torry's statement to the jury. Officer Merritt said that Mr. Torry did not mention Mr. Hill during the interview. Mr. Torry reviewed his statement, initialed each page, and signed at the end. On redirect examination, Officer Merritt said that Mr. Hill admitted during his interview that he was the shooter.

## II. Motion to Suppress

Defendant argues that the trial court erred in not granting his motion to suppress. Defendant contends that the police officers lacked probable cause to arrest him without a warrant, that he did not knowingly waive his Miranda rights, and that his written statement was the result of coercion and not a free and voluntary act.

At the suppression hearing, Sergeant Helldorfer testified that Defendant was developed as a suspect in the charged offenses based on the statements of Mr. Torry and Mr. Lampkins. After Defendant's arrest, Sergeant Helldorfer said that Defendant was read his Miranda rights, that he freely and voluntarily waived those rights, and signed a waiver of his rights. Defendant's mother, Paula Fletcher, was present when Defendant was advised of his Miranda rights, and both Defendant and Ms. Fletcher reviewed Defendant's statement before both signed it. Additionally, Defendant and Ms. Fletcher initialed each page indicating that they had read the page. Neither Defendant nor Ms. Fletcher made any changes to the statement.

On cross-examination, Sergeant Fletcher acknowledged that Defendant provided several versions of the events at the Linc Minimart before executing his written statement. Sergeant Helldorfer stated that as Defendant's explanation changed during the course of the interview, his statement became more consistent with the statements provided by other individuals. Sergeant Helldorfer acknowledged that the main inconsistency between Defendant's statement and Mr. Torry's statements was the fact that Defendant identified Mr. Hill as the shooter. In addition, Mr. Torry placed Mr. Lampkins at the scene of the crime while Mr. Lampkins told the investigating officers that he left the group of men before they reached the convenience store.

Sergeant Helldorfer said that Defendant was arrested without a warrant, and he and Ms. Fletcher were transported to the police department in separate cars. Sergeant Helldorfer conceded that Defendant had "probably not" been allowed to speak to Ms. Fletcher prior to the commencement of the interview. Sergeant Helldorfer stated that Defendant had a ninth grade education, that he read his Miranda rights aloud, and that he was able to answer questions about his rights. Sergeant Helldorfer said that he did not ask Ms. Fletcher about her educational background. Sergeant Helldorfer stated that it was departmental policy to allow only one parent to accompany a minor suspect into the interview room. He did not recall whether he was aware that Mr. Dale had arrived

at the police station during the interview, but if Defendant had asked for his father to be present in place of Ms. Fletcher, he would have accommodated Defendant's request.

Sergeant Helldorfer interviewed Defendant for two hours before Defendant gave a written statement. Sergeant Helldorfer said that Defendant gave several versions of the incident prior to giving a written statement. Each time, Defendant would either add a different detail or leave a detail out. Sergeant Helldorfer stated that Defendant's arrest resulted from two witnesses identifying Defendant as present when the offenses were committed. Sergeant Helldorfer acknowledged that the witnesses' statements varied as to whether Defendant was the shooter.

Paula Fletcher testified on behalf of the defense. Ms. Fletcher said that she was not home the first time that the police officers came to her house. Her daughter allowed the officers in, and they searched the house looking for Defendant. The officers left when they ascertained that Defendant was not at the house. Ms. Fletcher said the police officers returned to her house after she had arrived home. The police officers told her that she needed to come to the police station immediately, and Ms. Fletcher was not given the opportunity to call any other family members. Ms. Fletcher stated that the police officers did not have either an arrest warrant or a search warrant.

Ms. Fletcher said that Sergeant Helldorfer did not tell either her or Defendant about Defendant's right to counsel before beginning Defendant's interview. Sergeant Helldorfer repeatedly left the interview room and kept telling Defendant that a witness had identified him as a participant in the offenses. Ms. Fletcher heard voices in the hallway and learned that Mr. Dale had arrived at the police station. Ms. Fletcher told Sergeant Helldorfer that Mr. Dale needed to talk to Defendant. Sergeant Helldorfer told her that Mr. Dale could come into the interview room after Defendant had executed his written statement.

On cross-examination, Ms. Fletcher said that she did not know anything about the offenses until the interview. Ms. Fletcher stated that Sergeant Helldorfer did not advise Defendant of his <u>Miranda</u> rights, but she then acknowledged that both she and Defendant signed the waiver and that Sergeant Helldorfer "read [Defendant] something off of" the form. Ms. Fletcher agreed that she and Defendant reviewed and signed Defendant's written statement but said that Sergeant Helldorfer "kept rushing" them. Ms. Fletcher stated that she did not understand what was happening.

A. Standard of Review

The trial court's findings of fact at a suppression hearing are presumptively correct on appeal "unless the evidence preponderates otherwise." <u>State v. Walton</u>, 41 S.W.3d 75, 81 (Tenn. 2001) (quoting <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." <u>Odom</u>, 928 S.W.2d at 23. The application of the law to the facts is reviewed <u>de novo</u>. <u>Walton</u>, 41 S.W.3d at 625.

B.  Probable Cause for Arrest

Defendant argues that the investigating officers lacked probable cause to arrest him without a warrant.  Defendant submits that Sergeant Helldorfer's motivation for arresting Defendant was pretextual based on his acknowledgment at the suppression hearing that he did not believe everything that Mr. Torry and Mr. Lampkins told him during their interviews.  See United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L. Ed. 877 (1932) ("An arrest may not be used as a pretext to search for evidence.").

An officer may make a warrantless arrest "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." T.C.A. § 40-7-103(a)(3).  "Our courts make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest."  State v. Herbert Lee Massey, No. 01C01-9401-CR-00218, 1995 WL 518872, at *4 (Tenn. Crim. App., at Nashville, Nov. 5, 1995), no perm. to app. filed (citing State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982). Probable cause depends on whether the facts and circumstances and reliable information known to the officer at the time of arrest were "'sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487, 491 (Tenn.1997) (quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223 (1964)).

Probable cause may rest upon many factors, one of which is identification of the defendant at the scene when the offenses were committed.  State v. Lawrence, 154 S.W.3d 71, 76 (Tenn. 2005); State v. Claybrook, 736 S.W.2d 95, 102 (Tenn. 1987); State v. Robert A. Cummins, No. W2000-00277-CCA-R3-CD, 2001 WL 912792, at *5 (Tenn. Crim. App., at Jackson, Aug. 10, 2001), no perm. to appeal filed (finding probable cause for the defendant's warrantless arrest based on the statements of his co-defendants implicating the defendant in the offense).

Nonetheless, Defendant argues that Mr. Lampkins' and Mr. Torry's statements identifying Defendant as one of the perpetrators were not reliable because in other aspects the statements were dissimilar.  Specifically, Mr. Torry said that Mr. Lampkins was present during the commission of the crime, which Mr. Lampkins denied, and Mr. Torry said that he heard Defendant acknowledge shooting the victim, while Mr. Lampkins said that he did not know who the shooter was because he was not with the group at that time.  However, both witnesses placed Defendant at the scene of the crime and both described his clothing as consisting of a white tee shirt, blue jean shorts, and white shoes.

Based on our review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the investigating officers had probable cause to arrest Defendant without a warrant.  Defendant is not entitled to relief on this issue.

C. Waiver of Miranda Rights

Defendant argues his waiver of his Miranda rights was not knowingly or voluntarily made. Defendant, who was seventeen years old at the time of the offenses, contends that he was subjected to repeated interrogations despite his protestations of innocence until he finally gave a written statement implicating himself in the commission of the offenses. Defendant submits that he was kept separate from Ms. Fletcher for two hours at the police station before he was Mirandized, and that he was not allowed to speak to his father before or during the interview. Ms. Fletcher testified at the suppression hearing that she felt "pressured" and "rushed" throughout the process, and that notwithstanding her signature, she did not understand the waiver form.

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and right to counsel before they may initiate custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Id. at 444, 86 S. Ct. at 1612. If an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992), overruled on other grounds by State v. Stout, 46 S.W.3d 689 (Tenn. 2001). A statement given in violation of a defendant's constitutional rights may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994).

When the accused is a juvenile and full Miranda warnings have been provided and understood, the voluntariness and admissibility of the juvenile's confession is not dependent upon the presence of his or her parents at the interrogation. State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999). The appropriate standard for determining admissibility is "whether, under the totality of the circumstances, the . . . confession was the result of a knowing and intelligent waiver of . . . constitutional rights." State v. Lundy, 808 S.W.2d 444, 446 (Tenn. 1991). Our supreme court has held that the court must consider the following factors:

(1) . . . all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

(2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;

(3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

Callahan, 979 S.W.2d at 583. Further, "[w]hile courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." Id. (citing Colorado v. Connelly, 479 U.S. 157, 107 S. Ct. 515 (1986)).

Sergeant Helldorfer initially testified at the suppression hearing that he believed that Defendant was brought to the police station approximately two hours before the interview began, during which he was not allowed to speak to Ms. Fletcher. Sergeant Helldorfer then refreshed his recollection by reading his supplemental notes and testified that Defendant was arrested at 5:25 p.m. and the interview was begun at 5:57 p.m. Sergeant Helldorfer acknowledged again that Defendant was not allowed to speak to his mother during this thirty-minute interval.

Sergeant Helldorfer said that Defendant told him that he had completed the ninth grade, that Defendant read the waiver form aloud, that Ms. Fletcher was present when Defendant was advised of his Miranda rights, and that Defendant and Ms. Fletcher both signed the waiver form. Ms. Fletcher testified that she did not know anything about the offenses and was "stunned." Ms. Fletcher felt "rushed" into signing the form and stated that she did not really understand the contents of the waiver form. However, as the State points out, Defendant did not testify at the suppression hearing as to whether he shared Ms. Fletcher's emotions.

The trial court accredited the testimony of Sergeant Helldorfer and found that there was no indication in the record that Defendant "or his mother ever said I want to talk to a lawyer, ever said we don't want to give a statement, we don't want to say anything, we want to cut this off." Based on the totality of the circumstances, the trial court found that Defendant understood his rights and that he voluntarily waived those rights. After a review of the record, we conclude that the evidence does not preponderate against the trial court's findings. Defendant is not entitled to relief on this issue.

D.  Written Statement

Defendant argues that the coercive police tactics used during the interview rendered his written statement involuntary, and the trial court therefore erred in denying his motion to suppress on this basis. Specifically, Defendant points to the fact that Sergeant Helldorfer (1) repeatedly questioned him despite Defendant's consistent denial of any involvement in the offenses; (2) continuously left and entered the interview room with information about what other witnesses were saying about the offenses; (3) prohibited Defendant from speaking with his father until after he gave

-11-

a written statement; and (4) threatened Defendant with confinement if he did not give a statement. Defendant also submits that Ms. Fletcher described the interview process as "rushed."

In Tennessee, for a confession to be considered voluntary, it must not be the product of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43, 18 S. Ct. 183 (1897)). The essential question therefore is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544, 81 S. Ct. 735 (1961)). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. Smith, 933 S.W.2d at 455.

The trial court accredited Sergeant Helldorfer's testimony at the suppression hearing as was within its province as trier of fact. Sergeant Helldorfer testified that Defendant was brought to the police station at 5:25 p.m., and the interview began approximately thirty minutes later. Sergeant Helldorfer described the interview process as "extremely fast" and stated that it "generally takes longer." There is nothing in the record to suggest that Sergeant Helldorfer threatened Defendant or made any promises of leniency in exchange for his statement other than to inform Defendant that he would be held in the jail after the interview. Sergeant Helldorfer could not recall whether he was informed when Mr. Dale arrived at the police station. Sergeant Helldorfer stated that if Defendant had requested that his father sit in on the interview rather than Ms. Fletcher, he would have accommodated Defendant's request.

The investigating officers were interviewing Mr. Torry and Mr. Lampkins at the same time as Defendant, and Sergeant Helldorfer periodically interrupted Defendant's interview to confer with the other investigating officers. The trial court found that:

> there's nothing that indicates that [the interview] was done in a threatening manner. There's nothing that indicates [there] was any chicanery or trickery. There's nothing that indicates that this was other than investigative technique. You got one witness that's saying one thing. You walk back there and say well, he says that. What do you say? There's nothing improper about that interrogation as far as I can determine based on what I've heard.

At the conclusion of the suppression hearing, the trial court further found that based upon the testimony presented at the hearing, Defendant's statement was freely and voluntarily given. Based on our review of the record, we conclude that the evidence does not preponderate against the trial court's finding that Defendant's statement was voluntary. Accordingly we affirm the trial court's denial of Defendant's motion to suppress his statement. Defendant is not entitled to relief on this issue.

## III. Prosecutorial Misconduct

Defendant argues that the prosecutor engaged in misconduct during his cross-examination of defense witness, Cordareyes Torry. During direct examination, Mr. Torry testified that Defendant did not go into the Linc Minimart with the other perpetrators but instead stood outside the store talking to Mr. Torry while the offenses were committed. On re-cross-examination, the following colloquy occurred:

[THE STATE]: You [Mr. Torry] told me the other day when we were back there talking that you said you don't [know] who went in that store.

[DEFENSE COUNSEL]: Objection. Hearsay.

MR. TORRY: I told you . . .

THE COURT: Just a minute. Overruled.

During a conference in the presence of the jury but out of their hearing, the following transpired:

[DEFENSE COUNSEL]: Your Honor, [the prosecutor] is making himself a witness at this point. We can't cross-examine without calling him to testify about this communication.

[THE STATE]: I'm just asking him what I asked him.

THE COURT: Ask him a question. I'll allow him to ask the question.

[DEFENSE COUNSEL]: Well, then can I cross-examine [the prosecutor]?

THE COURT: No.

Mr. Torry's re-cross-examination resumed as follows:

[THE STATE]: When I met with you back in the jail, back in the room, I think it may have been in a different courtroom, when I interviewed you back there, you told me, the final thing when I left you, remember?

MR. TORRY: Uh huh.

. . .

| [THE STATE]: | And when I finally asked you, you said you don't know who went into that store. |
|---|---|
| MR. TORRY: | No. |
| [THE STATE]: | Because you didn't know. |
| MR. TORRY: | I didn't tell you that. |

On redirect examination, Mr. Torry explained that the prosecutor asked him who went into the Linc Minimart on the night of the offenses and that Mr. Torry said that he told the prosecutor that he did not see Defendant go into the store.

At the conclusion of the hearing on Defendant's motion for new trial, the trial court found that the question was not improper. However, even if error, the trial court found that the prosecutor's questions had no impact on the verdict in the case. The trial court observed that:

> Mr. Torry was here to testify and he testified to what the defense wanted him to testify to, that [Defendant] didn't go in. He was cross-examined. Rebuttal proof was put on that he had previously told the police something different. So there was a lot of issues to judge the credibility of Mr. Torry, and I don't think that [the prosecutor's] question was the basis for the verdict in this case.

On appeal, Defendant argues that the prosecutor intentionally placed his credibility before the jury during Mr. Torry's re-cross-examination. Defendant submits that because the State's case-in-chief rested entirely on the statements of the various witnesses, "credibility took on an added importance." Defendant contends that the prosecutor's misconduct during this exchange "effectively took the question of the witness' credibility out of the jury's hands." The State argues that it was allowed to impeach Mr. Torry's credibility with his prior inconsistent statements and that the prosecutor's questions, therefore, were not improper.

It is well-settled "that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to review for abuse of discretion." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993). It is also well-settled that the credibility of a witness may be attacked by any party, and the witness's prior inconsistent statements may be used for impeachment purposes. Tenn. R. Evid. 607, 613. Initially, then, the prosecutor's use of Mr. Torry's prior statements which were inconsistent with his trial testimony was proper under Rule 613.

Nonetheless, Defendant submits that because the prosecutor was the recipient of the inconsistent statements, his use of the evidence for impeachment purposes violates the general prohibition against a prosecutor expressing his or her personal opinion about any issue raised in the case or asserting a personal opinion as to the credibility of a witness in the case. State v. Goltz, 111

S.W.3d 1, 6 (Tenn. Crim. App. 2003); State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). However, in the context of this case, we conclude that the prosecutor's questions were not improper. See State v. Richard Shelton, C.C.A. No. 140, 1989 WL 1136, at *2 (Tenn. Crim. App., at Knoxville, Jan. 11, 1989), perm. to appeal denied (Tenn. May 8, 1989) (concluding that even if the prosecutor had established during cross-examination that the witness's inconsistent prior statement had been made to her, such examination would not have been improper or made the prosecutor a witness to the case).

However, even if error, we conclude that the brief exchange did not affect the verdict to Defendant's detriment. The prosecutor abandoned the line of questioning when Mr. Torry denied that he told the prosecutor that he did not know who entered the Linc Minimart prior to the offenses, and Mr. Torry was extended the opportunity on redirect examination to explain the substance of his responses to the prosecutor's questions during the pre-trial interview. Moreover, Mr. Torry's credibility was challenged on numerous occasions during Sergeant Merritt's rebuttal testimony, and Defendant's own statement to the police in which he admitted being present in the Linc Minimart when the offenses were committed and omitted any reference to Mr. Torry's presence at the crime scene. Accordingly, we conclude that Defendant is not entitled to relief on this issue.

## IV. Cumulative Effect of Errors

Defendant argues that the cumulative effect of the errors during his trial affected the verdict to his detriment and deprived him of a meaningful defense. However, we have concluded that the trial court did not err in denying Defendant's motion to suppress, and any error during Mr. Torry's re-cross-examination was harmless. Therefore, as no other errors exist, there is no "cumulative effect of errors" which serve to deny Defendant's rights to a fair trial. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE